In re Estate of HUGH W. THOMASSON, FORD W. THOMPSON v. BOAT-
MEN'S NATIONAL BANK OF ST. LOUIS, Administrator *Pendente
Lite* of the Estate of HUGH W. THOMASSON, Appellant.—148 S.
W. (2d) 757.

Division One, March 13, 1941.

*James V. Frank, Franklin E. Reagan* and *Chas. Claflin Allen, Jr.*, for appellant.

750

*Igoe, Carroll, Keefe & McAfee* and *J. W. McAfee* for respondent.

752

HAYS, J.—Respondent, an attorney at law, exhibited in the probate court of the City of St. Louis a demand against the estate of Hugh W. Thomasson, deceased, for legal services alleged to have been rendered by him to decedent in connection with the defense of an insanity proceeding in the circuit court of the City of St. Louis. The probate court disallowed the demand; but, on appeal to the circuit court, a trial to a jury resulted in a verdict for respondent in the sum of $10,000, and from the judgment entered thereon Thomasson's administrator *pendente lite* has appealed. For convenience we will speak of the respondent as plaintiff and of the appellant as defendant.

Litigation involving Mr. Thomasson and his estate has been before this court many times during the past decade. We shall here briefly summarize the facts as they are disclosed by the present record.

In the summer of 1930 Thomasson was 74 years old—a man of small stature, feeble in body and of slowly failing intellectual power. His education had been limited to two terms in a common school; but natural business acumen had enabled him to amass and conserve a considerable fortune. He had no immediate family and lived alone in the Fairmont Hotel in St. Louis. An adventuress, who during the course of her long and checkered career had passed under numerous aliases but to whom we shall refer as "Grace Allen," was then sojourning in St. Louis. An acquaintance pointed out Mr. Thomasson to her, saying that if she married him she would be the smartest woman in the city. She took a room at the Fairmont, succeeded in getting an introduction to Thomasson and began to telephone him, send him notes and take him riding in a borrowed automobile. After she had thus gained his confidence she managed, fraudulently and without his knowledge, to procure an Illinois license authorizing her marriage to him. She thereupon took him across the river where a ceremony was performed by a justice of the peace, the words thereof being spoken in so low a tone that Thomasson did not know what was being done.

For the purpose of the present case it will be unnecessary to trace in detail the further workings of her scheme. Suffice it to say that, by kidnapping Thomasson and by using threats of bodily violence and through the employment of every species of fraud, she obtained from him deeds to a considerable part of his real estate and possession of some valuable property. Thomasson instituted certain suits

against her to annul the purported marriage and to cancel the conveyances to her. Again she kidnapped him and kept him in close confinement, transporting him from place to place about the country. They finally returned to and settled in St. Louis County.

At this point some of Thomasson's collateral kindred, through their attorneys, filed an information in the probate court of the City of St. Louis alleging that Thomasson was insane and incapable of managing his affairs. Grace Allen was then represented by one Wilfred Jones, at that time a licensed attorney. Jones had served as prosecuting attorney of St. Louis County and was somewhat prominent in county politics. Believing that through his agency she could control the choice of a guardian in the county, Grace Allen caused an insanity proceeding to be filed there.

Two lawyers appeared representing Thomasson in the case pending in the city court: one Shad Bennett and the late Randolph Laughlin. It is by no means clear from the record whether they were retained by Thomasson himself or by Grace Allen; but, without passing on the question, we may say that there was some evidence in the record tending to connect them with her later activities.

Plaintiff had been for many years a practicing lawyer in St. Louis. Under one of those arrangements which, for reasons of economy, are not uncommon among the members of the bar, he occupied the same suite of offices with Laughlin and a number of other attorneys, but he and Laughlin were not partners. Plaintiff became connected with the defense of the insanity case in the City of St. Louis as counsel for Thomasson. Because of his statutory incompetence to testify in the present case as to any transaction between himself and the decedent, plaintiff was prevented from making direct proof of the manner in which his services were engaged. Two other witnesses however—doctors who had examined Thomasson during the insanity trial and found him to be sane at the time—testified for plaintiff. Both said Thomasson had told them that plaintiff was one of his lawyers and that he was highly satisfied with the manner in which plaintiff was conducting his defense.

When the information was filed in the City of St. Louis alleging Thomasson's insanity he was sojourning in the county. As to whether he was there as a voluntary resident or as a captive of Grace Allen is in dispute. For a time after the filing of the information the sheriff found it impossible to serve Thomasson. Counsel for the informants filed in the St. Louis Court of Appeals a petition for a writ of *habeas corpus*, alleging that Thomasson was held prisoner by Grace Allen. When Thomasson was not produced in obedience to the writ, the court issued a warrant for him and, at a time when he was in the custody of the marshal under this warrant, the sheriff served him with notice of the insanity proceeding. Grace Allen then took Thomasson to Illinois where a suit in equity was commenced in a local chancery

court in his name, as complainant, and purporting to be against her, as defendant. The bill alleged that Thomasson was a citizen and resident of Illinois and prayed annulment of the marriage between him and Grace Allen, and another and later purported marriage between them. It alleged that at the time of these purported marriage ceremonies he was insane, but had since been restored to sanity. No process was served on the defendant, but she entered her general voluntary appearance and consented to immediate trial. The trial itself, so far as Thomasson's side of the case was concerned, seems to have been an empty formality, with the natural result that a decree was passed finding that the plaintiff was sane at all times involved and was still sane on the date of trial. It was shortly after this that the present plaintiff first appeared as Thomasson's counsel. He is not shown to have had any connection with any previous litigation up to and including the equity case in Illinois. In the insanity case in the City of St. Louis a plea in abatement was filed for Thomasson, in which it was alleged that the purported service of notice was illegal and void; that the court was without jurisdiction because Thomasson was not a resident of the city and that the issue of his insanity had been fully adjudged in the Illinois equity suit, the decree in which was entitled to full faith and credit. On the issues joined upon this plea a trial was had. This was the trial in which plaintiff participated, and it is known in the record as the "90 day trial." At the end thereof the jury returned a verdict upon the plea in abatement in favor of the informants, thus clearing the way for a trial on the merits.

Shortly after the beginning of this trial another equity suit was commenced in the Circuit Court of the City of St. Louis. It was filed in the name of Thomasson, as plaintiff, and among other things the bill prayed an injunction against the further prosecution of the insanity case. Counsel for the informants in the insanity case, who among many others were named as defendants in the equity suit, applied to this court for a writ of prohibition, which we granted. While the matter was pending before us, suggestions in opposition to the granting of the writ were filed. These were verified by the oath of a number of persons, one of whom was the present plaintiff. The verified suggestions, among other things, denied that Grace Allen was conspiring with others to fraudulently obtain Thomasson's property.

At the end of the 90 day trial Grace Allen took Thomasson away from St. Louis. This time they went to Arkansas where she went through with another purported marriage ceremony with him. While they were in Arkansas a man named New, who is shown to have been an associate of Grace Allen and is described as a "hot diamond merchant," filed an insanity information against Thomasson in that state. After another perfunctory trial a verdict was returned finding

that he was sane. Grace Allen obtained a room for Thomasson in a boarding house where she left him to himself, so weak and sick that he was unable to leave the premises and spent most of his time sitting in this room staring into space.

About this time an attempt was made in St. Louis to remove the insanity proceeding to the District Court of the United States upon the ground that Thomasson had become a resident of Arkansas and a diversity of citizenship, necessary to that court's jurisdiction, had been thus created. Removal was denied. The cause was set for trial on its merits in the State court; but, before the day for it to commence had arrived, Thomasson died.

At the close of the evidence for plaintiff in the present case and again at the close of the entire case defendant requested a directed verdict in its favor. Both requests were overruled, and these actions of the trial court were assigned as error. However, appellant has not specifically briefed this matter and we must therefore treat the assignment as abandoned. [Our Rule 15; Majors v. Malone, 339 Mo. 1118, 100 S. W. (2d) 300.] The appellant alleges as error the failure of the trial court to give an instruction which it requested and which is designated in the record as Instruction "A." The said requested instruction is in the following language:

"If you believe and find from the evidence that Grace Mahood entered into a conspiracy with others for the purpose of obtaining Hugh W. Thomasson's property unlawfully, and if you further find that after the filing of the insanity suit against Hugh W. Thomasson in the City of St. Louis she procured the help of Shad Bennett and Randolph Laughlin to assist her in said conspiracy by purporting to represent Hugh W. Thomasson in said insanity suit for the purpose of conducting said defense in her interest, if you so find, and even though you find that the claimant, Ford W. Thompson, did not know of the existence of the conspiracy aforesaid, if any you find, and did not know that Randolph Laughlin and Shad Bennett were assisting Grace Mahood in said conspiracy, if you so find, nevertheless, if you believe and find from the evidence that claimant, Ford W. Thompson, had knowledge of sufficient facts and circumstances to place a reasonable man on inquiry as to whether any conspiracy existed, if you find such facts and circumstances and conspiracy did exist, and failed to make such inquiry, and if you further find from the evidence that the services for which he seeks compensation were in the interest of Grace Mahood, then he is not entitled to compensation from the Estate of Hugh W. Thomasson and your verdict shall be for the defendant."

In this connection it is worthy of note that the court gave, at the request of the defendant, an instruction in which the jury were told that if they found that Grace Allen had entered into a conspiracy with others to defraud Thomasson and in furtherance of the con-

spiracy had procured the help of Shad Bennett and Randolph Laughlin by having them purport to represent Thomasson in the insanity suit, and if they further found that plaintiff had knowledge of the conspiracy and with such knowledge undertook to help Laughlin and Bennett in the defense of the insanity suit in the interest of the woman, and if they further found that the services for which plaintiff was seeking compensation were performed in the interest of Grace Allen, they should find for the defendant.

■ We are of the opinion that the trial court correctly refused to give Instruction "A." Even though a requested instruction correctly states some legal principle, it should not be given unless warranted by the evidence in the particular case. [Yancey v. Central Mutual Insurance Assn. (Mo. App.), 77 S. W. (2d) 149; Spitzengel v. Greenlease Motor Co. (Mo. App.), 136 S. W. (2d) 100.] The principal difference between Instruction "A" and that actually given by the court is that the instruction given permitted a verdict for the defendant if the plaintiff knew of the alleged conspiracy on the part of Grace Allen and acted in furtherance thereof, whereas the requested instruction would have permitted such verdict if plaintiff, although actually ignorant of the conspiracy and not making himself a party thereto, was simply negligent in failing to learn of its existence. There is no evidence whatever in the record tending to show the state of facts hypothesized in the requested instruction.

In support of its request for said instruction appellant calls our attention to the testimony of one witness who had a talk with plaintiff during the progress of the 90 day trial. This witness testified that plaintiff told him he was representing Mrs. Thomasson (Grace Allen). If this evidence tended to prove anything it had a tendency to prove actual knowledge of and participation in the conspiracy on behalf of plaintiff which hypothesis was covered in the given instruction. It has no tendency to prove a negligent failure of plaintiff to discover the existence of the conspiracy.

■ Appellant also calls attention to the fact that in the prohibition proceeding plaintiff filed and swore to suggestions in which it is specifically denied that Grace Thomasson (Allen) and others were conspiring to fraudulently obtain Mr. Thomasson's property. We fail to understand the logical process by which appellant infers from this fact that plaintiff had knowledge from which, in the exercise of reasonable care, he could have learned that the conspiracy did exist. From the fact that a man swears that a certain state of facts is not true, it does not follow that he knew the facts were true or that he had knowledge from which, in the exercise of reasonable care, he could have reached that conclusion. Nevertheless, in the performance of our full duty, we proceed to consider the soundness of the requested instruction as a matter of law. It is quite obvious that if the plaintiff had actual knowledge of the fraudulent scheme of Grace

Allen and actually knew that the defense of the insanity proceeding was made in furtherance of that scheme and, so knowing, concealed these facts from his client, that he would not be entitled to a fee. ''The lawyer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability.' '' [Par. 15, of our Rule 35.] He may not with propriety represent conflicting interests. [Par. 6 of our Rule 35.] And when in the execution of a task for which he has been retained he fails to exercise the highest good faith toward his client, he is not entitled to compensation for his work. [Donaldson v. Eaton & Estes (Iowa), 114 N. W. 19, 14 L. R. A. (N. S.) 1168; Davis v. Swedish-American Natl. Bank (Minn.), 80 N. W. 953, 79 Am. St. Rep. 400.] A lawyer also is an officer of the court. As such he owes to the court the duty of absolute fairness and candor. Where he deliberately asserts a defense in fraud upon the tribunal before which he appears, he forfeits his right to compensation from his client. [Duffy v. Colonial Trust Co. (Pa.), 135 Atl. 204, 49 A. L. R. 406, certiorari denied: 273 U. S. 765, 47 Sup. Ct. 570, 71 L. Ed. 880.]

But the instruction here under consideration goes further than denying recovery to the plaintiff if he were guilty of fraud against his client or the court. It denies him recovery if in the defense of the insanity case he had been guilty of negligence, even though the result of such negligence did not affect the interests of his client. It is true that if an attorney so negligently acts in the conducting of litigation that his client's cause is jeopardized, he should not be allowed to recover for a fee. [5 Am. Jur. 363.] But the present instruction goes even further than this. Under it if plaintiff knew of facts which might lead him to suspect the existence of Grace Allen's fraudulent scheme and if he failed to investigate the matter of the existence of such fraudulent scheme, recovery would be denied, even though such failure to investigate did not in any manner affect the actions he was about to take in the defense of the insanity case. Assume that the plaintiff reasonably and in good faith believed that Thomasson was sane (and there is no evidence in this record tending to show that Thomasson was insane at the time he retained plaintiff); assume that Thomasson had, under circumstances obviating the possibility of coercion, instructed plaintiff to defend the insanity proceeding and to prevent by all lawful means an adjudication against him therein. Plaintiff would certainly have not been entitled to abandon that defense simply because he suspected or knew that Grace Allen and her coconspirators wanted, for purposes of their own, the same result. Yet, under the requested instruction, plaintiff would be denied compensation even though he at all times was acting in good faith for Thomasson, if he were simply negligent in failing to investigate the activities of Grace Allen in connection with her scheme to obtain Thomasson's property.

For these reasons, therefore, we hold that the requested instruction was unsound and that it was properly refused by the trial court.

The appellant next assigns error upon the refusal of the trial court to admit in evidence the petition in the case of Thomasson v. Frank Real Estate Company. This was the equity proceeding which we have mentioned above and in which, among other things, the plaintiff sought to enjoin further proceedings in the insanity case. Respondent contends that this petition was not permissible in evidence because it was hearsay. The argument, however, fails to consider the fundamental distinction between hearsay statements and extrajudicial utterances admitted not for the purpose of proving the fact therein asserted to be true, but simply because the statements themselves formed necessary links in a chain of circumstantial evidence. This distinction has been most carefully stated in Wigmore on Evidence (3 Ed.), sec. 1766: ''The theory of the Hearsay rule is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but without reference to the truth of the matter asserted, the Hearsay rule does not apply. . . . It may or may not be received. according as it has any relevancy in the case.''

The petition in the Frank Real Estate case was not offered in evidence for the purpose of inducing the jury to believe the truth of the matters therein asserted, but only for the purpose of showing that certain claims were made. The question becomes then simply one of relevancy. Was the fact that such a suit was started, taken in connection with the subsequent history thereof, a link in a chain of circumstantial evidence tending to prove any of the necessary elements of defendant's case. We recapitulate those elements insofar as they form the basis of this assignment of error and of certain others to follow. It was necessary for defendant to show that a fraudulent scheme on the part of Grace Allen to defraud Thomasson existed; that the defense of the insanity proceeding was an essential step in carrying out that scheme; that through fraud or duress she induced Thomasson to defend; and that plaintiff, knowing these facts, conducted the defense in that case, nominally in behalf of Thomasson but in reality as the agent or party in crime of the Allen woman. If the institution of the Frank Real Estate case and the claims made in the petition therein constituted one link in a chain of circumstances tending to establish any one of these essential elements, it was relevant and therefore admissible. Now the record shows that when this equity suit was filed, attempting as it did to stop proceedings in the insanity case and thus gain the same result that would have been attained had the insanity case been won, the inform-

ants in the latter case applied to us for prohibition to stop the equity suit. The record also shows that that application for prohibition was resisted not only by the present plaintiff, as Thomasson's attorney, but by Grace Allen who was one of the parties who along with plaintiff verified the respondent's suggestions filed with us in that case. This chain of circumstances has a tendency to show the activity of Grace Allen in defeating the insanity proceeding. It is hence relevant to show her activity and her interest in connection with the defense of that case. The full force and effect of Grace Allen's opposition to the granting of our writ of prohibition could not be understood until the nature of the case, the prosecution of which we prohibited, was made known by the evidence. The nature of that case could only appear if the petition therein were allowed to go to the jury. The relevancy of that petition therefore appears certain and the court below erred in excluding it from the evidence.

Appellant also complains of the refusal of the trial court to admit in evidence the records of the St. Louis Court of Appeals in the *habeas corpus* proceeding. These records, among other things, show that the informants in the insanity case instituted the *habeas corpus* case; that the granting of the writ therein was resisted by Grace Allen and that that case resulted in remanding Thomasson to the custody of the guardian appointed in St. Louis County—a guardian who according to the theory of the present appellant had been practically selected by Grace Allen. The records of the Court of Appeals also show that after this order of remand was secured an attempt was made to vacate or modify the same and this attempt was opposed by Grace Allen. These records, like those in the Frank Real Estate case, have a strong tendency to show the activity of Grace Allen in defense of the insanity proceeding. They are therefore relevant on the same grounds and for the same reasons expressed above in connection with the petition in the Frank Real Estate case. The trial court erred in refusing to admit them in evidence.

Appellant also complains of the refusal of the trial court to permit it to show that in the Arkansas insanity proceeding no evidence in regard to the mental condition of Mr. Thomasson was introduced by the informant. The purpose of this evidence was not to demonstrate Mr. Thomasson's actual mental condition, but it was to show that the proceeding was a fraud and a sham and was brought for the mere purpose of aiding in the defense of the insanity case in St. Louis. For that purpose the evidence was relevant and should have been received.

Error is also assigned upon the failure of the trial court to admit certain checks drawn by Randolph Laughlin in favor of Grace Thomasson and others. The original checks were not offered, but counsel agreed to the use of copies in lieu of the originals. However, the plaintiff below did not waive proof of the execution and

delivery of the instruments and no such proof was made. Obviously in the absence of such preliminary proof the instruments could not properly be admitted.

Error is also assigned upon certain rulings of the trial judge in connection with argument of counsel. Appellant's counsel sought to comment upon the failure of respondent to put Shad Bennett on the witness stand. The court refused to permit this. The rule is well established that where a given witness is equally available to both of the parties, neither of them may draw any adverse inference from the failure of the other to put such witness on the stand. [Winkler v. Pittsburgh, etc., Railroad Co., 321 Mo. 27, 10 S. W. (2d) 649; Chavaries v. National Life & Accident Ins. Co. (Mo. App.), 110 S. W. (2d) 790; McInnis v. St. Louis-Southern, Inc., 341 Mo. 677, 108 S. W. (2d) 113; Dougherty Real Estate Co. v. Gast (Mo. App.), 95 S. W. (2d) 877; Miller v. Collins, 328 Mo. 313, 40 S. W. (2d) 1062; Donet v. Prudential Ins. Co. (Mo. App.), 23 S. W. (2d) 1104.] In this connection appellant contends that Bennett was not equally available to both parties. Appellant says that Bennett and the plaintiff were coconspirators and that within the reason of the rule announced in the above cases, Bennett's evidence was not available to it. As we have seen, however, there is no evidence in the record tending to show Bennett and plaintiff were coconspirators. There is no evidence tending to show that plaintiff was a party to the conspiracy and fraud proven against Grace Allen. Certainly the mere fact that Bennett and plaintiff were cocounsel employed by the same client would not give plaintiff such control over Bennett or such knowledge of Bennett's relationship to Grace Allen as to make him unavailable to the appellant in the sense in which that term is used in the cases. [Rothschild v. Barck, 324 Mo. 1121, 26 S. W. (2d) 760.]

Appellant also claims that the court erred in refusing it the right to comment on the fact that Wilfred Jones was counsel in the insanity case. The remark of appellant's counsel involved in this assignment was as follows: "Now, Judge Hoffmeister, I asked him on cross-examination, I asked him if Wilfred Jones wasn't there during that trial. He said, 'Why, yes, I considered he was one of the lawyers in the case; he sat at the counsel table with Ford Thompson.' "

In sustaining the objection to this remark the trial judge said: "I think counsel has inadvertently misquoted some of the evidence. I don't think Judge Hoffmeister went that far." The actual testimony on this point was as follows: "Question: Wilfred Jones was there throughout the trial, wasn't he? Answer: Wilfred Jones was in and out. He sat at a chair some. Question: Sat at the counsel table? Answer: If I may state what I think Wilfred Jones' position in this case was, he was a sort of investigator. In other words, if something would come up that required some investigation he would slip out, and might be gone a few hours, and might

come back; but he was constantly in and out during the trial of the case. . . . Question: You considered him counsel in the case? Answer: I think he was assisting, yes. If he was assisting, he might write out a court memorandum for the other counsel and perhaps sign their names to it."

It is somewhat open to question whether the testimony above given was fairly summarized by the argument of counsel. But in any event no prejudice could have been worked by the sustaining of this objection. The same argument in slightly different form could have been properly made without objection.

Again, counsel for appellant sought to argue that "They have to kidnap him and keep him from coming into court." Objection to this remark was sustained. The trial court believed that by the pronoun "they" counsel intended to refer to the present plaintiff among others. We do not have the full context before us. If such were the meaning of the argument sought to be made, it was improper since there was no evidence tending to connect the present plaintiff with the kidnapping. As the same remarks will probably not be made in the event of a new trial, it is unnecessary for us to rule specifically on these assignments of error.

Because of the refusal of the trial court to receive in evidence the various matters above referred to, the judgment below must be reversed and the cause remanded. It is so ordered. All concur.