## IN RE FALZONE.—220 S. W. 2d 765.

St. Louis Court of Appeals. Opinion filed May 17, 1949.

Motion to reconsider and modify opinion denied June 17, 1949. Mandamus to compel Clerk to accept notice of appeal denied by Supreme Court September 12, 1949.

*M. P. Phillips* for informants.

*Joseph A. Falzone* and *Clifford A. Falzone* for accused.

PER CURIAM:—This is an original proceeding in this court upon an information filed by the Advisory Committee of the Missouri Bar charging Joseph A. Falzone, an attorney at law, with certain acts of misconduct, and praying the court, after hearing the charges, to enter an order removing him from the practice of law in this state.

The informants' right to invoke our original jurisdiction arises out of the fact that certain of the acts of alleged misconduct occurred in our district, and that the accused both resides and has an office for the practice of law in our district. Supreme Court Rule 5.03.

Following the filing of the information, the court appointed Honorable Robert L. Sutton as Special Commissioner with full power and authority to hear the case and to report the evidence together with his findings of fact and conclusions of law. Thereafter the Special Commissioner filed his report finding the accused guilty as charged and recommending that he be disbarred from the practice of law. Exceptions were filed by the accused; and after oral argument, with the right accorded both parties to file briefs, the matter has been submitted on both the merits of the case and the accused's exceptions for the entry of such final judgment by the court as its own findings and conclusions may require.

The two acts or particulars of misconduct charged against the accused were separately stated in the information as required by Supreme Court Rule 5.05.

The first act relied on is that in 1938 and 1939, the accused, in violation of Supreme Court Rule 4.27, solicited a number of tavern owners in St. Louis County, both by letter and in person, to retain him as their counsel to represent them in connection with charges brought against them for their alleged violation of certain statutes.

The second and more serious charge is that on February 19, 1945, while the accused was a member of the Missouri Senate, he solicited a bribe of $1,500 from one Lillian V. MacCallum at the Governor Hotel in Jefferson City, Missouri, for his assistance and efforts as a member of the Senate in the preparation and introduction, and in securing the passage by the General Assembly, of a bill relating to the occupation of cosmetologists; that he was thereafter charged in the Senate with such offense, and was brought to trial thereon on October 29, 1945; that on November 1, 1945, before the completion of the trial, he tendered his resignation as a member of the Senate, thereby terminating the proceeding; and that by reason of the conduct so charged against him the accused had violated Supreme Court Rule 4.47 in that he had willfully and knowingly committed acts against the interest of the public, and had been guilty of misconduct where-

by, for the protection of the public and those charged with the administration of justice, he should no longer be entrusted with the duties and responsibilities belonging to the office of an attorney.

For his answer to the first charge, the accused denied the charge, and affirmatively pleaded laches and res adjudicata, the latter defense being put upon the ground that a hearing on such complaint had been held before the Bar Committee of the Thirteenth Judicial Circuit, and no charge had been preferred against him by said Committee.

Answering the second charge, the accused denied that he had solicited a bribe from Lillian V. MacCallum or any one else, and represented that certain penciled notations appearing on two of his official legislative cards, which notations are relied upon by the informants as supporting and evidencing the charge of attempted bribery, were either intended to be merely explanatory of legislative procedure, or else related to matters in no way connected with the proposed legislation.

The Special Commissioner has reported the full details of the evidence respecting the charge of attempted bribery.

Mrs. MacCallum had testified both before the Senate Investigating Committee and at the Senate trial, but was not available as a witness at the hearing before the Special Commissioner. It was shown that she had gone to Arizona to be with a sick daughter and intended to remain in the West for an indefinite period, in view of which the transcript of her testimony as given at the Senate trial was admitted at the hearing before the Special Commissioner.

At the time in question Mrs. MacCallum was employed as director of cosmetology and hairdressing in the State Department of Health. She resided in the City of St. Louis, and prior to assuming the position of director had been an inspector in St. Louis County, where the accused resides and has his law office.

In June, 1944, a movement was begun to obtain desired amendments to the Missouri statute relating to the occupation of hairdressers, cosmetologists, and manicurists. Conferences were had by the interested parties, and at a meeting in St. Louis on February 5, 1945, representatives were selected to secure the passage of the amendments. Mrs. MacCallum, being connected with the State Department of Health, was delegated to contact the accused, who was then Chairman of the Senate Committee on Public Health, and was of her own political affiliation. It was also decided that Mrs. Jennie Walsh, herself a cosmetician and at that time a member of the House of Representatives of the opposite political faith, should be contacted to obtain her influence in getting the amendments through the House.

Other persons chosen to assist in the matter were Mrs. Mary Wood, the proprietor of a school of beauty culture in Jefferson City; Miss

Edna L. Emme, a cosmetologist, who had her place of business in St. Louis and was also assistant manager of the Godefroy Manufacturing Company, a manufacturer of cosmetics located in St. Louis; Charles W. Godefroy, president of the manufacturing company and chairman of the legislative committee of the Missouri Cosmetologists Association; and Frank J. Vanek, a scalp specialist and cosmetician engaged in business in St. Louis, and chairman of the legislative committee of the St. Louis chapter of the Missouri State Cosmeticians Association.

A proposed bill was prepared and then taken by Godefroy to Jefferson City and submitted to the accused, who agreed to handle the bill. After having it rewritten so as to conform to Senate rules, the accused introduced it in the Senate on February 20, 1945, with Senator Wilbur W. Sunderwirth of Eldorado Springs as cosponsor. Mrs. Wood and Mrs. MacCallum had previously conferred with the accused about the matter, and both of them were likewise present with Godefroy in the accused's office when the final arrangements were made for the introduction of the bill.

The attempt at bribery allegedly occurred during the evening of February 19, 1945, and it was on that occasion, according to Mrs. MacCallum's testimony, that the accused gave her the two cards with the penciled notations upon them.

The cards were identical business cards bearing on their face in print the accused's name, business address, and telephone number, as well as a reference to his membership in the Missouri Senate.

On the back of the one card, identified as Exhibit 9, there is the following in pencil writing:

> "$1500.00
>
> _____
> _____
> _____
>
> Lester Watson
>
> _____
> _____
>
> 300.00"

There is a penciled circle around the figures "$300.00".

On the face of the other card, identified as Exhibit 10, there appears in pencil writing the name, "Lester", with lines and check marks underneath. On the back of the card is the following in pencil writing:

> "Rewrite
>         Parts of
> Bill - as is
> necessary
> Handle bill

884

on floor of
Senate if bill
is reported ok.—
employ man in
House if Bill
gets that far
to Handle on floor—''

The accused admits his authorship of all the penciled notations on the two cards, but contends, as our reference to his answer has already indicated, that the matter on the back of Exhibit 10 was intended to be merely explanatory of legislative procedure, and that the matter on the back of Exhibit 9 related to a piece of legal business in no way connected with his sponsorship of the proposed bill.

According to Mrs. MacCallum's version of the facts, the accused telephoned her in the afternoon of February 19th and invited her to confer with him that evening at the Governor Hotel with reference to the bill. Pursuant to this arrangement she met him in the lobby, and was taken to the rear of the lobby where she and the accused sat down together. The two of them were alone, and she testified positively that Mrs. Florence Many was not in their company. The significance of this denial will subsequently appear.

In the course of an extended conversation the accused advised Mrs. MacCallum that it would take money to get the bill through the Legislature. He represented, among other things, that he would have to employ a man in the House, and that there would be expense for entertainment and the like in order to induce members to vote for the bill. Because of the number of organizations interested in the proposal, he suggested the payment of $1,500, out of which he would give Mrs. MacCallum $300 for her own share. She replied that she did not want any of the money for herself, and then told him that she would call the persons who had been chosen to promote the passage of the bill and apprise them that a fund of money would be required. She inquired if this was what he wished her to do, and he not only informed her to go ahead, but also suggested that she go upstairs to his room in the hotel and use his telephone.

At this point Mrs. MacCallum remarked that she would be unable to remember everything the accused had told her, whereupon he again sat down at the table, took a card out of his coat pocket, and wrote something on the back of it. This was the card identified as Exhibit 10. When he handed her the card, she did not read what had been written on it. They continued to converse about the matter, and as they began walking along together, he scribbled the notations on the back of the second card identified as Exhibit 9. At the time he gave her the first card he informed her that the money would have to be paid to Lester Watson, who handled all of his affairs. She suggested that she could remember the name ''Watson'' because there was a

Watson Road in St. Louis County, but could not remember the first name. With that he reached over and took Exhibit 10 out of her hand and wrote the name "Lester" on the face of it.

By way of explanation it should be stated that Lester Watson is an attorney at law, and at the time of the hearing before the Special Commissioner was serving as an assistant prosecuting attorney of St. Louis County. Prior to such appointment he had occupied an office in the same suite with the accused and a number of other lawyers. He testified that he and the accused had never been associated together in any legal matter, and he denied that any arrangement had ever existed for him to accept money for or on behalf of the accused for any purpose. It had been the common practice among the lawyers in the suite that if a letter or document came in for some one of them who was temporarily out of his office, anyone of them who was available would, as a matter of courtesy, accept such letter or document and lay it on the other's desk, but save for some such service Watson had had nothing to do with the accused's business. He specifically asserted that he had known nothing whatever about the bill in question until mention of it appeared in the metropolitan newspapers and he was interrogated by the Senate Investigating Committee.

While the accused remained downstairs in the lobby, Mrs. Mac-Callum went upstairs to his room, and representing herself to be his secretary as he had told her to do, put in calls for Miss Emme and Messrs. Vanek and Godefroy, all in St. Louis. None of the calls could be completed that evening for the reason that Miss Emme was away from home, while Vanek and Godefroy had unlisted telephone numbers. Later in the evening Mrs. MacCallum telephoned Mrs. Wood in Jefferson City, and told her of the accused's demand. The next morning she was able to complete her calls to both Miss Emme and Mr. Vanek, and likewise advised both of them in regard to what the accused had said.

Over the accused's objection, Mrs. Wood, Miss Emme, and Mr. Vanek were permitted to testify that Mrs. MacCallum had called them on the particular occasion and had informed them of the accused's disclosure that a fund of money would be required to secure the passage of the bill. Miss Emme and Mr. Vanek likewise testified to an incident that occured at one of the doors to the Senate Chamber on April 11, 1945. They had gone to inquire of the accused regarding the status of the bill, and finding the Senate in session, had asked that the accused come outside the Chamber to confer with them. According to their testimony, the accused told them the bill was in his Committee, placing his hand on his pocket as if to emphasize the word "Committee".

The accused gave his own explanation of the notations on the two cards and the manner in which the cards had left his possession.

He testified that on a Saturday early in February he had been stopped on the street in Clayton by a client, Mrs. Vera Smith, who asked if she might discuss the collection of a note for $1,500 that was long past due. He took one of his cards out of his pocket, wrote on it, "$1500.00", and then computed and wrote underneath the amount of his contingent fee of twenty per cent or $300. Mrs. Smith then stated that she would bring the note to his office the following Monday, and he suggested that if his secretary should happen to be out of the office, she might give the note to Lester Watson. He thereupon wrote "Lester Watson" on the card and offered it to her, but she declined it with the remark that she could remember the name without the card. With this he put the card back in his pocket, and later, by inadvertence, apparently gave the card to Mrs. MacCallum when she asked for one of his cards at his office. This was the card identified as Exhibit 9. He further testified that while Mrs. Smith was reading a letter to him on that occasion, he pulled another card out of his pocket and, by way of mere doodling, wrote the name "Lester" and made other marks on the face of it. This was the card identified as Exhibit 10.

Mrs. Smith and other witnesses tended to corroborate the accused in a general way regarding his employment to collect the note and the circumstances under which he had made the notations on the cards. Lester Watson testified that he had never heard of Mrs. Smith, and knew nothing about the collection of her note.

Regarding the writing on the back of Exhibit 10, the accused testified that at the conference in the lobby of the Governor Hotel on the evening of February 19th, he and Mrs. MacCallum were not alone as she had testified, but that his wife and a Mrs. Florence Many were also present. After he had informed Mrs. MacCallum that the bill was ready to be introduced, Mrs. Many spoke up and said that she would like to learn how a bill was handled. The accused thereupon produced a card, which happened to be Exhibit 10, and after writing what now appears on the back of it, handed it to Mrs. Many with the remark that it comprised her "legislative lesson". There was more or less support for the accused's version of this particular incident on the part of his wife and Mrs. Many; and the implication would of course be that Mrs. MacCallum obtained the card from Mrs. Many.

There was evidence to show that the accused's resignation from the Senate was prompted solely by the illness of his wife, and that in the opinion of at least one of his counsel he would have been acquitted by the Senate if the trial had been permitted to go to its conclusion.

The Special Commissioner pointed out in his report that while Mrs. MacCallum's testimony had been clear, positive, and convincing, and had withstood a grueling cross-examination without any impairment of its probative force, the accused's explanations had been far

from satisfactory. In fact the Special Commissioner observed that the notations on the two cards, and particularly the matters appearing on the back of Exhibit 10, were not subject to any satisfactory explanation differing from Mrs. MacCallum's version of the facts. The Special Commissioner concluded that the evidence, by its greater weight, had clearly convicted the accused of the offense of soliciting a bribe as embraced in the second charge of the information, and plainly merited the withdrawal of his privilege to continue to practice law.

As for the first charge, which was not extensively reviewed in the .report, the Special Commissioner held that the evidence had likewise clearly convicted the accused of the offense of soliciting employment in connection with his sending of letters to sixty-five tavern owners in St. Louis County, which letters had been designed to get himself employed to represent such tavern owners in defense of indictments charging them with the felonious violation of the liquor laws. The Special Commissioner further held that neither the defense of laches nor that of res adjudicata had been sustained by the evidence.

For his first exception to the Special Commissioner's conclusions with respect to the bribery charge, the accused argues that it was error to admit the transcript of Mrs. MacCallum's testimony which she had given at the hearing before the Senate. The accused insists that such testimony was hearsay and should have been held inadmissible upon two principal grounds, the one, that there was no proper showing of Mrs. MacCallum's unavailability as a witness at the hearing before the Special Commissioner; and the other, that the hearing before the Senate was not a judicial trial.

There is no doubt that the burden was on the informants to show, as a condition to their right to introduce the transcript of Mrs. MacCallum's former testimony, that she was unavailable as a witness at the hearing before the Special Commissioner. The record indicates that the Special Commissioner was under no misapprehension regarding the informants' obligation. On the contrary, he heard the preliminary evidence accounting for the nonproduction of Mrs. MacCallum, and then ruled (and we think correctly so) that the circumstances were such as to show her nonavailability. A subpoena had been issued and delivered to the Marshal of this court for service upon her. The subpoena was returned "not found", although the evidence shows that a search was made for Mrs. MacCallum at every address where either the Marshal or the informants' counsel had any reason to suspect that she might be located. The best information obtainable was that she had gone to Arizona and would be away from this state indefinitely. Whether the informants had shown the exercise of due diligence to procure her attendance was confided largely to the discretion of the Special Commissioner, and under the circumstances shown in evidence it does not appear that his discretion was in any-

888

wise abused. Drake v. Kansas City Public Service Co., 333 Mo. 520, 63 S. W. 2d 75; Welp. v. Bogy, 218 Mo. App. 414, 277 S. W. 600; Bender v. Bender, Mo. App., 193 S. W. 294; Fowler v. Cavitt, Mo. App., 294 S. W. 731.

Nor was the transcript inadmissible upon the ground that the hearing before the Senate was not a judicial trial. It may be conceded that the Senate, in conducting the hearing in question, was not transformed into a part of the state judiciary, if that is what the accused has in mind. It unquestionably retained its status as one of the two· component parts of the legislative branch of the state government. Nevertheless it was not performing its usual legislative function of lawmaking, but instead was exercising its special constitutional prerogative of being the sole judge of the qualifications of one of its own members. Const. of 1945, Art. III, Sec. 18.

An act may be judicial, whether or not performed by the judiciary itself, if it is an act in the performance of which it is necessary to consider and pass on evidence and arrive at a determination with respect thereto. In its broad sense it is the nature or quality of an act which determines whether it is judicial, and not the character of the person or instrumentality that may be authorized to perform it. 50 C. J. S., Judicial, p. 565.

So regarded, the Senate, while a legislative body, was none the less exercising a judicial function in determining, from the evidence adduced, whether the accused should be allowed to continue as one of its members. Furthermore, the issue before the Senate was identical with the issue before the Special Commissioner; and Mrs. MacCallum's testimony was given under oath and subject to cross-examination by the accused or his counsel. That the complaining or prosecuting parties were not identical in the two instances· is immaterial so long as the evidence was to be used against the accused, who was the same in both cases. Absolute identity or direct privity of interest is only required in the case of the one against whom the evidence is to be used so as to vouchsafe the opportunity for effective cross-examination. Bartlett v. Kansas City Public Service Co., 349 Mo. 13, 160 S. W. 2d 740: In the present situation there can be no pretense of a denial of the accused's right of cross-examination; and the transcript of Mrs. Callum's testimony at the hearing before the Senate was therefore competent at the trial of the same issue in this proceeding before the Special Commissioner. In re Lacy, 234 Mo. App. 71, 112 S. W. 2d 594; In re Pate, 232 Mo. App. 478, 119 S. W. 2d 11.

For his second exception the accused claims that the Special Commissioner committed error in excluding the testimony of one H. A. Elder, a witness for the accused, whose testimony was purportedly offered by the accused for the purpose of showing, among other things, that Mrs. MacCallum was in the vicinity during the latter part of the trial at least, and was evading service of a subpoena.

When the Special Commissioner made his initial ruling admitting the transcript of Mrs. MacCallum's former testimony over the accused's objection, he announced the further condition that if it should appear that Mrs. MacCallum could be produced before the hearing was concluded, the informants would be required to produce her as a witness in lieu of the transcript of her former testimony.

It appears that the witness Elder, a private investigator, had been given a subpoena by the accused to serve on Mrs. MacCallum. He too was unsuccessful in obtaining service upon her; and the controversy arose when the accused asked him to tell where he had gone in his efforts to serve her. Althought there was no distinct offer of proof, the accused apparently had in mind that the witness would relate certain hearsay indicating that she was then in the St. Louis area; and the accused argued, among other things, that inasmuch as the Marshal had been permitted to say what he had found in the course of his efforts to serve Mrs. MacCallum, his own witness, Elder, should be accorded the same leeway. Pointing out that it had been shown, not only by the Marshal's hearsay testimony, but also by other testimony, that Mrs. MacCallum was out of the jurisdiction, the Special Commissioner took the position that since the transcript of her former testimony had, for that reason, been competent when offered, it could not be rendered incompetent by subsequent testimony. The accused thereupon acquiesced in the Special Commissioner's ruling, and announced that he would withdraw the question.

Such action on the accused's part leaves but little for this court to review. The Special Commissioner had before him the Marshal's non est return as well as the testimony of Elder that he likewise had been unable to serve Mrs. MacCallum. In addition to the Marshal's testimony as to what others had told him, he also had before him the testimony of Godefroy, Mrs. MacCallum's then employer, that to the best of his knowledge she had been away for three weeks or so. In the face of all such evidence regarding her nonavailability, the Special Commissioner was not required, after the transcript of her former testimony had been properly admitted, to reopen the whole question near the conclusion of the case upon the basis of what, in the light of Elder's own inability to find her, could apparently have amounted to no more than a mere rumor. It is highly significant that the accused himself became of the same opinion after the Special Commissioner had explained his view in the matter, and he now has no basis for complaining about the Special Commissioner's refusal to permit the witness to answer a question which he himself voluntarily withdrew.

For his third exception the accused complains of the admission of the testimony of Mrs. Wood, Miss Emme, and Mr. Vanek regarding conversations with Mrs. MacCallum over the telephone in the course of which she told them of the accused's alleged solicitation of a bribe.

He insists, of course, that all of such testimony was inadmissible as hearsay.

The Special Commissioner admitted such testimony under the doctrine that where, regardless of the truth or falsity of the statement, the fact that it has been made is relevant, the statement may be admitted in evidence as an exception to the hearsay rule. 31 C. J. S., Evidence, Sec. 239. The Special Commissioner took the view that inasmuch as Mrs. Wood, Miss Emme, and Mr. Vanek were jointly interested with Mrs. MacCallum in the taking of whatever steps might be necessary to secure the passage of the bill, the latter's conversations with them served as a relevant link in the whole chain of circumstantial evidence. What Mrs. MacCallum said to these witnesses was concededly no evidence of the truth of the fact that the accused had made a demand upon her for money. However it did show that in undertaking to accomplish their common purpose, she herself had informed the others that a fund of money would be required and in this way directly corroborated her own testimony that she had called the three witnesses in regard to the very matter in controversy. In such respect her statements were independently and circumstantially relevant, and the Special Commissioner committed no error in admitting them in evidence. In re Thomasson's Estate, 347 Mo. 748, 758, 148 S. W. 2d 757, 763.

It is true, as the Special Commissioner stated in his report, that in a case such as this the inquiry is not limited or circumscribed by the strict rules of evidence (In re Lacy, supra), and that technicalities are not permitted to prevent consideration of anything reasonably available which goes to the merits of the case. Leimer v. Hulse, 352 Mo. 451, 178 S. W. 2d 335.

Notwithstanding the appointment of a Special Commissioner to hear the evidence and report his findings, this court must still weigh the evidence as a whole and reach its own conclusions regarding what the result shall be, with due deference to the Special Commissioner's findings on any conflicting testimony of the witnesses appearing before him. In re Sizer, Mo. App., 134 S. W. 2d 1085; In re Williams, 233 Mo. App. 1174, 128 S. W. 2d 1098. Mindful of such obligation on our part, we have considered the evidence for ourselves, and agree with the Special Commissioner that the evidence, by its greater weight, convicted the accused of soliciting a bribe as charged against him in the information. The only question has been which party's evidence should be believed, and whether the informants proved the charge by competent evidence. There has never been, and could not be, a question but that the charge, if found to be true, would require that the accused be disbarred from the practice of law.

For his exceptions to the Special Commissioner's findings on the charge of soliciting business, the accused renews his complaint that

such charge should have been dismissed upon the ground of laches and res adjudicata.

We agree with the Special Commissioner that the evidence showed the accused to have been guilty of professional misconduct in sending out the letters to sixty-five tavern owners in St. Louis County with the design of getting himself employed by all of such tavern owners in the defense of indictments charging them with violation of the liquor laws. We also agree with the Special Commissioner that the matter is not res adjudicata, although for reasons presently appearing it is our opinion that such charge should not now be considered, if it was intended to be so, as an independent ground for disciplinary action.

The informants' own evidence shows that there were two hearings on this very matter before the Bar Committee of the Thirteenth Judicial Circuit, a formal hearing on March 24, 1939, and a concluding hearing on April 13, 1939; that at the formal hearing on March 24th the matter was fully gone into by the Committee with all members present; and that at the hearing on April 13th "Joseph A. Falzone appeared before the Committee and was reprimanded for his action in the Tavern Owners' matter". It may be added that the language quoted is taken from the official minutes of the Bar Committee as attested by the then Secretary of the Committee. The matter was finally concluded with the accused's reprimand, and no information was filed against him in court.

The matter was investigated, heard, and disposed of by the Committee acting under what it evidently conceived to be the power conferred upon it by the third subdivision of what was then known as Supreme Court Rule 36, but is now identified as Rule 5.03.

Under such rule a Circuit Bar Committe is authorized, with or without formal complaint, to investigate in a summary and informal manner any matter of professional misconduct alleged to have been committed by a member of the bar in its circuit. If, upon such investigation, a majority of the Committee finds that there is reasonable cause to believe that the member under investigation has been guilty of professional misconduct, it shall cause a formal hearing to be held on the charge. If, after such formal hearing, a majority of the Committee finds that there is probable cause to believe the accused guilty of the misconduct charged, it shall file an information against him in court, but unless a majority of the Committee finds that there is probable cause to believe the accused guilty of the misconduct charged against him, the charge shall be dismissed.

It is then provided by Rule 5.08(f) that at the conclusion of any hearing, and after the Committee shall have finally disposed of the matter, the complete record of such proceedings before the Committee, including, among other things, the transcript of the evidence

together with the order of the Committee disposing of the matter, shall be filed with the Clerk of the Supreme Court.

It has been said that the action of a Bar Committee in failing to prefer charges after conducting its own investigation amounts to a finding of not guilty. In re Sizer, supra. Ordinarily this would no doubt be true, although it is not precisely true in the present instance. However the important thing is not so much what action the Bar Committee took as the fact that it did take final action.

While the Committee, in its discretion, evidently concluded that the situation before it was not such as to call for the filing of an information in court, it obviously did not exonerate the accused from all blame. On the contrary, it found that his conduct at least merited a reprimand, which was administered to him as the Committee's minutes show.

It may be suggested that the rules, taken literally, gave the Committee no authority to administer a reprimand, and that its power actually extended no further than to determine, as a condition to the filing of an information in court, whether there was probable cause to believe the accused guilty of the misconduct charged. Nevertheless the Committee, acting in its official capacity, and whether rightly or wrongly, did take such disciplinary action as it felt the case required.

This is not to say that the Committee's action became res adjudicata, for no action of a Committee could be allowed to frustrate the courts in their right and duty to exercise final control over all disbarment matters. In re Conner, 357 Mo. 270, 207 S. W. 2d 492. Furthermore, a disbarment case is not an adversary proceeding. In re Richards, 333 Mo. 907, 63 S. W. 2d 672. However there is no escaping the fact that the Committee's action was intended to be a final disposition of the matter. Ten years have since elapsed during which there is no claim that the accused has been guilty of the same character of misconduct. Neither does the solicitation charge have any relation to the bribery charge so as to show a course of conduct. If the finding of guilt on the bribery charge left any room for doubt upon the question of the accused's fitness to remain a member of the bar, there would be the more reason to disregard the Committee's action and reopen the prior charge, but under the peculiar circumstances of the case we cannot believe, as we have already said, that such charge should now be considered as an independent ground for disciplinary action. The accused's conviction on the bribery charge is alone sufficient to require that he be disbarred from the practice of law, and we therefore enter judgment accordingly.

The costs in a proceeding such as this are to be taxed as the court, in its discretion, may order. Supreme Court Rule 5.10. By order of court and stipulation of the parties the total amount of $2,500 has been deposited by the informants out of the Bar Fund for the immediate payment of all costs in the case regardless of the order of the

court as to how they shall ultimately be taxed. The total costs aggregate the sum of $2,317.40. Since the result is not based upon the first charge which the accused was nevertheless called upon to defend, he should not be held liable for all the costs. However the greater part of the costs have been incurred in the trial and disposition of the bribery charge upon which he has been found guilty and upon ·which the result is based. It is therefore considered and adjudged that of the total costs the sum of $1800 shall be taxed against the accused, and that if and when such judgment is satisfied, the proceeds shall thereupon be paid into the Bar Fund to reimburse that fund for so much of its deposit for costs. The balance of the costs in the amount of $517.40 shall be taxed against the informants in their official capacities to be paid out of the Bar Fund; and the sum of $182.60 remaining on deposit out of the total amount of $2,500 heretofore deposited out of the Bar Fund for costs shall be remitted by the Clerk of this Court to the Clerk of the Supreme Court as the treasurer and custodian of the Bar Fund.

*Anderson, P. J.,* and *McCullen* and *Hughes, JJ.,* concur.