**UNITED STATES of America**

**v.**

**Perry LYNCH, Appellant.**

**No. 71–1803.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1972.

Decided May 7, 1974.

Daniel G. Grove, with whom John J. Collins, Washington, D. C. (both appointed by this Court) was on the brief, for appellant.

Julius A. Johnson, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, John A. Terry and John F. Evans, Asst. U. S. Attys., were on the brief, for appellee.

Before TAMM and MacKINNON, Circuit Judges and WADE H. McCREE, Jr.* Circuit Judge, for the Sixth Circuit.

McCREE, Circuit Judge.

On August 29, 1968, at approximately two a.m., Robert Mitchell was shot and killed on the corner of 7th and N Streets, N.W. The appellant, Perry Lynch, was arrested on October 4, 1968, and was tried by jury, beginning on

* Sitting by designation pursuant to Title 28, U.S.C. § 291(a).

April 28, 1971, in the United States District Court for the District of Columbia upon a two-count indictment charging first degree murder [1] and carrying a dangerous weapon.[2] After all the evidence had been presented, the court granted appellant's motion for a judgment of acquittal on the first degree murder charge but denied the motion for acquittal on the lesser included offenses. The case was submitted to the jury, which returned a verdict of guilty of both second degree murder and the dangerous weapons offense. The court imposed concurrent sentences of from five to twenty years for murder and of one year for carrying a dangerous weapon.

On appeal the appellant raises nine issues,[3] the most significant of which are, in our view, (1) whether appellant's right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution was abridged by the delay of approximately thirty-one months from arrest to trial; and (2) whether the district court erred in admitting in evidence at trial the preliminary hearing testimony of the only eyewitness who identified appellant, when this witness, although apparently still within the jurisdiction of the court,

---

1. 22 D.C.Code § 2401 (1967).

2. 22 D.C.Code § 3204 (1967).

3. Appellant raises the following issues in his brief:

1. Whether the 31 month delay between arrest and trial, during which time the defendant is incarcerated, is a denial of the right to speedy trial when not more than three months of this delay is attributable to the defendant and when the major portion of the delay was caused by a one year incarceration at St. Elizabeths Hospital which was largely unjustified?

2. Whether, if prejudice other than mere incarceration is required to make out a case for denial of speedy trial, prejudice is found when it is shown that the defendant developed hysterical amnesia concerning the events of the crime and that the ability to cure this amnesia was proportionately reduced by the passage of time and because of the amnesia the defendant was denied the right to testify to facts [which were recalled under narco-analysis] would have exculpated him from criminal responsibility?

3. Whether the right to fair trial and effective assistance of counsel are violated when a defendant who is suffering from amnesia is deprived of the right to produce a valid and viable defense to the charge of first degree murder because he is unable to testify to facts which he recalled under narco-analysis and when the Government's case does not foreclose all hypotheses of innocence?

4. Whether the right to confrontation and/or the Federal Rules of Criminal Procedure permit the use of, at a trial for first degree murder, the preliminary hearing transcript of the critical government witness who fails to appear for trial although still in the jurisdiction, when that preliminary hearing testimony is garbled and confused and when the defense counsel at the preliminary hearing had neither the time nor the tactical inclination to develop impeachment of the witness and when the rules of evidence at a preliminary hearing are such that full cross-examination is not permissible?

5. Whether a defendant in a first degree murder case who is unable to testify because he suffers from amnesia may be denied the right to explain his inability to testify in his own behalf to the jury by the use of expert medical testimony?

6. Whether a defendant who suffers from amnesia concerning the date of the crime may be denied his right to offer a defense to first degree murder when the only way that defense may be offered to the jury is through the defendant's statements made while under the influence of narco-analysis, when an extraordinarily qualified psychiatrist is of the opinion that the responses under narco-analysis were candid and accurate?

7. Whether an instruction on aiding and abetting is appropriate when there is no testimony that the defendant was anything but the principal?

8. Whether a witness who did not incriminate himself before the Grand Jury, though he testified, may be compelled to testify over objections at trial when his testimony at trial produces admissions of perjury before the Grand Jury and when that testimony is highly prejudicial to the defendant?

9. Whether it is proper to allow cross-examination beyond the scope of direct examination of a witness whose testimony in chief simply impeached the credibility of a Government witness, when the cross-examination elicits hearsay statements of others who did not testify which are highly prejudicial to the defendant?

failed to appear at the trial. We conclude that under the peculiar circumstances of this case appellant was not denied his constitutional right to a speedy trial. We agree, however, that the government should not have been permitted to introduce the preliminary hearing testimony of the absent witness because it did not adequately demonstrate that this critical witness was "unavailable" at the time of trial. Accordingly, we hold that the admission of the preliminary hearing testimony at trial was erroneous as a matter of federal evidentiary law. Appellant's conviction is vacated and because of our decision on this issue, we find it unnecessary to consider the other issues raised on appeal.

## I

■■ We consider, first, appellant's contention that the lengthy interval between his arrest and trial was an undue delay that deprived him of his constitutional right to a speedy trial. In assessing this contention we are guided by the decision of the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 701 (1972), which declared that speedy trial claims require courts to employ a sensitive balancing process in which "the conduct of both the prosecution and the defendant are weighed." 407 U.S. at 530. The Court identified some of the factors that should be considered in this necessarily *ad hoc* determination: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530 (footnote omitted).

■ With these criteria in mind, we first identify the period of delay that is properly challenged in this case. Appellant contests the government's failure to bring him to trial for a period of thirty-one and one-half months after the date of the offense. Because United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), established that the speedy trial right does not inhere until there is "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge," 404 U.S. at 320, we do not consider any delay occurring before appellant's arrest on October 4, 1968. Accordingly, we focus attention on the period of approximately thirty-one months from the date of arrest to the time of trial, April 28, 1971.

A delay of this magnitude must be examined critically by anyone concerned with the rights of criminal defendants and the broader interest of society in the fair but prompt administration of justice. However, this observation does not lead ineluctably to the conclusion that appellant was deprived of his right to a speedy trial.[4] Instead, this delay draws our attention to the attendant costs to society and to possible prejudice to appellant and thereby mandates our inquiry into all factors relevant to a determination whether the constitutional right to a speedy trial has been abridged.

The first factor that we consider is the reason for the delay. We observe that different periods of delay occurred for different reasons. Although the shooting took place on August 29, 1968, appellant was not arrested until about one month later, on October 4. On October 17, 1968, a preliminary hearing was held. Appellant's arraignment on the indictment was held on November 15. Approximately one month later, appellant filed a motion for a mental examination to determine his competency to stand trial. This motion was granted and appellant was admitted to Saint Elizabeths Hospital for a period not to exceed sixty days. This initial period was twice extended by the court for suc-

---

4. Indeed, in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court held that a delay of over five years between arrest and trial did not, under the circumstances presented in that case, deny the defendant his constitutional right to a speedy trial.

cessive thirty-day periods. Then, without any further order of the court, as far as the record on appeal discloses, appellant was detained at the hospital until mid-January 1970, some time after the hospital's report was finally filed with the court. The government conceded that "[t]he only cause for this lengthy examination period was the heavy backlog at Saint Elizabeths at the time." Brief for Plaintiff-Appellee at 7.

The hospital's report indicated that appellant was competent to stand trial. On February 25, 1970, appellant objected to the findings of the report. A hearing was scheduled for March 9, 1970, but was continued until March 23 to permit the defense to gain access to the records of the hospital evaluation. On March 23, appellant moved for the appointment of an independent psychiatrist to examine him. The motion was granted, and on April 14, Dr. John Cavanaugh, an independent psychiatrist, was appointed. Dr. Cavanaugh filed his report on April 29, 1970. A hearing followed on June 10 and subsequently the court determined that appellant was competent.

On August 17, 1970, appellant filed a motion for release on personal recognizance, and after a hearing on August 25, he was admitted to the work-release program.

Subsequently, on November 5, 1970, appellant for the first time filed a motion to dismiss the indictment because he had been denied a speedy trial. It is significant that this first expression of appellant's desire to expedite the proceedings did not occur until the expiration of more than two years and two months after his arrest. The motion was heard near the end of January 1971, at which time the court heard testimony of a detective about the availability of witnesses and entertained argument presented by appellant to demonstrate prejudice. Apparently the motion was denied, and when the case was called for trial on March 24, 1971, appellant renewed his motion to dismiss for lack of a speedy trial. The court entertained the motion and appellant presented additional testimony and argument. In addition, the court agreed to appoint another independent psychiatrist to examine appellant under the influence of sodium amytal to determine whether he had amnesia. On April 22, 1971, a hearing was held and the renewed motion to dismiss was apparently denied. Finally, on April 28 the trial was commenced.

This detailed factual outline makes it clear that we are not here concerned with a "deliberate attempt to delay the trial in order to hamper the defense," 407 U.S. at 531, which would, of course, "be weighted heavily against the government." *Id.* Appellant does not suggest, nor could he demonstrate on the record before us, that the government intentionally delayed prosecution "to gain some tactical advantage over [appellant] or to harass [him]." United States v. Marion, 404 U.S. 307, 325, 92 S. Ct. 455, 466, 30 L.Ed.2d 468 (1971). *See* Pollard v. United States, 325 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). Indeed, the record is barren of any indication, beyond the mere fact of delay itself, that the prosecution has not attempted to bring this indictment promptly to trial. Although we do not find it necessary to ascribe with mathematical precision various portions of the delay to the government, or, alternatively, to the defendant,[5] we conclude that,

---

5. On the basis of the following detailed analysis, the government asserts in its brief that the prosecution is not responsible for *any* significant delay in this case:

Thus from the time of appellant's arrest on October 4, 1968 to the time of his trial April 28, 1971 there is an interval of 30 months and 24 days, or roughly 31 months. Twelve months and one week (January 8, 1969–January 15, 1970) of this time were devoted to the mental examination of appellant at Saint Elizabeths, and the rendition of a competency report. Of the remaining 18 months, nearly 6 months (January 15–June 10) were devoted to disposition of appellant's objections to the competency report, necessitating a hearing (March 9 and 23) and apparently

excluding momentarily the lengthy period of hospital examination, a major portion of the remaining delay is attributable to procedures initiated by appellant to protect his rights and to develop his defenses. Viewed in this light, cumulative delay occasioned by appellant's

> inspiring defense request for further examination by an independent psychiatrist (Dr. Cavanagh), all of which culminated in a competency determination. Consideration of appellant's motion to dismiss the indictment, filed November 5, 1970 and renewed March 24 with the reception of considerable additional testimony ending with Dr. Yochelson's on April 22, involved a total of over five months (5 months and 23 days) before final disposition.
>
> Thus over 11 of the approximate 30 months can be associated immediately with defense matters as time (excluding momentarily the period of hospital examination) devoted to hearings, psychiatric examinations, and disposition of appellant's objections and motions. The approximate 20 months remaining include over 12 months for the Saint Elizabeths examination and report and a period of over 7 months between the apparent competency determination (June 10, 1970) and a status call of the case (January 10, 1971) when appellant's pending speedy trial motion had to be scheduled for hearing.
>
> It is immediately apparent to us that, while there is an unfortunately long interval before trial here, there is really little basis for attribution of any major portion of this time to the Government. It made no request for continuances, had no control over the case calendar system, and indeed tried to speedily bring this matter to trial. . . .
>
> . . . It would appear that if appellant believes he should claim the original 60 days for the hospital examination, it seems equally logical to assess against him the additional 60 days for that examination which Saint Elizabeths specifically requested since that time was apparently· made necessary by conditions beyond anyone's control—surely the prosecution's. For this reason, the entire examination period which ensued arguably should be assessed to him, or at least excluded from the computation of delay.
>
> Moreover, clearly more than a month is involved for independent psychiatric examination, since appellant requested examination by Dr. Cavanagh (involving delay of the competency determination from March 23 to June 10, 1970, almost 3 months) as well as the examination by Dr. Yochelson which involved delay from March 24 to April 22, 1971 (almost a month). Thus,

objections and motions, and by hearings thereon and psychiatric examinations does not present a strong case for relief. As this court has previously recognized:

> In any case, where a principal cause of postponement is the deliberate pace of the system of safeguards designd

> appellant's own calculation of delay attributable to him should be nearer 8 months (4 months for hospital examination plus 4 months for private examinations)—or 16 months if the total hospital examination period is included.
>
> The total period however for the disposition of his objections (January 15–June 10, 1970: 5 months, 5 days) and his motions (November 5, 1970–April 28, 1971: 5 months, 23 days) involving just these private examinations would be 10 months, 28 days, or approximately 11 months.
>
> From the remaining 20 months, the entire hospital examination and reporting period of slightly over 12 months (January 8, 1969–January 15, 1970) should be excluded completely, if not assessed against appellant, leaving about 8 months.
>
> Of these 8 months, almost 3 months (2 months, 26 days), representing the time between appellant's arrest (October 4, 1968) and his commitment to Saint Elizabeths (January 8, 1969) must be excluded as time spent in preparation for trial.
>
> The approximate 5 months remaining represent the period between appellant's competency determination (June 10, 1970) and the filing of his speedy trial motion (November 5, 1970) during which there was virtually no significant activity in the case. Even that time is not taxable to the prosecution because during that intervening summer the prosecutor himself tried diligently to obtain a trial of this case, even going to the unusual extent of asking another district judge to whom the case was *not* assigned to conduct the trial. It is apparent that the judge assigned this case became involved in a lengthy conspiracy case from sometime in September 1970 (shortly before appellant filed his speedy trial motion in November) until December 1970. Under the individual assignment system in the district court it was virtually impossible for this case to be tried at that time. In any event, it is at least clear that during this crucial period—the only significant time not covered by appellant's examinations or pending claims—this case was "beyond the power of the prosecutor to expedite." United States v. Bishton, [463 F.2d 887, 890 (D. C.Cir. 1972)].

Brief for Appellee at 9–12 (footnotes omitted).

to protect the accused, the courts have been exceedingly reluctant to find constitutional infirmity even in very long delays.

Blunt v. United States, 131 U.S.App.D.C. 306, 310, 404 F.2d 1283, 1287 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 22 L.Ed.2d 221 (1969) (footnote omitted).

See also United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); Wilkins v. United States, 129 U.S.App.D.C. 397, 395 F.2d 620 (1968); Hedgepeth v. United States, 124 U.S. App.D.C. 291, 364 F.2d 684 (1966).

■ We do not suggest that lengthy periods of time devoted substantially to procedures initiated by a defendant to protect his rights may never form the predicate for a determination that a speedy trial has been denied. But at least where this activity has not been further protracted by dilatory tactics engaged in by the prosecution, we are reluctant to assign controlling weight to delay occasioned by the defendant for his own protection.

There is, however, one segment of the delay here that cannot fairly be assigned to the appellant. In moving for a mental examination, the appellant cannot reasonably be held to have anticipated that an examination would require more than a year's detention at Saint Elizabeths Hospital before the filing of a report on his competency to stand trial. Appellant in his brief accepts responsibility for the delay caused by commitment for the first sixty days at Saint

Elizabeths Hospital. However, there remains a period of more than ten months of additional delay in Saint Elizabeths, in relation to which the only justification offered by the government was a "heavy backlog" at the hospital. Brief for Plaintiff-Appellee at 7. In Barker, the Supreme Court expressly noted that a "neutral reason such as negligence or overcrowded courts should be weighed less heavily [than an intentional attempt to delay trial to hamper the defense] but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." 407 U.S. at 531. We neet not decide today whether Barker would require us to charge against the government undue delay occasioned by commitment for a hospital examination,[6] for even assuming that ten months of the year-long detention in the hospital in this case should be charged against the government and assigned appropriate weight, this factor would not be controlling where, as here, appellant failed to assert his right to a speedy trial during this detention and also failed to show that he was prejudiced by this delay.

Here, appellant did not expressly assert his desire for a speedy trial until approximately two years and two months after his arrest. Moreover, appellant has not directed our attention to any other expression of his desire to expedite the proceedings before or during the lengthy detention at Saint Elizabeths Hospital for mental examination. To be sure, the Supreme Court in Bar-

---

6. Undue delay resulting from overcrowded hospital facilities, like delay from overcrowded courts, might be charged against the government, by analogy to the principle stated in Barker. The prosecuting attorney does not control the hospital, of course, but neither is it in his power to prevent the delay occasioned by congested dockets and overcrowded courts. In both cases, the government, with its vast resources, is in a sense more responsible for the delay than the defendant. We observe, however, that there are some differences between the two cases. First, although no one would suggest that the defendant should not be permitted to request a mental examination, it may appear unfair to impose upon the government the burden for delay arising as a consequence of this procedure initiated by the defendant. In addition, there is presumably no shortage of attorneys who would accept positions as judges, but there may be a shortage of psychiatrists willing to work at St. Elizabeths and similar institutions across the country, and it can be argued, therefore, that delay caused by congestion in hospitals should not be charged aginst the government as readily as delay in the courts is. See Strunk v. United States, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973).

*ker* expressly rejected the rule that "a defendant waives any consideration of his right to a speedy trial for any period prior to which he has not demanded a trial." 407 U.S. at 525. At the same time, however, the Court stressed that the defendant's failure to assert his right is a factor entitled to "strong evidentiary weight in determining whether the defendant is being deprived of the right." 407 U.S. at 532. The Court explained that the more serious the prejudice felt by the defendant, the more likely he is to complain. 407 U.S. at 531. Here, appellant's failure to assert his right to a speedy trial for over two years, casts doubt on any claim that he was seriously prejudiced by the delays before his release from the hospital.

This observation leads us to a consideration of the fourth factor noted by the Supreme Court in *Barker*, prejudice to the defendant. The Court in *Barker* explained that "prejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," 407 U.S. at 532, and mentioned three such interests identified in its prior decisions: (1) the prevention of oppressive pretrial incarceration; (2) the minimization of anxiety and concern of the accused; and (3) the limitation of prejudice to the accused's ability to defend. 407 U.S. at 532.

■ Appellant was incarcerated for approximately twenty-two months, including the detention in the hospital prior to his release under the work-release program. Ordinarily, such an extended pretrial incarceration might be viewed as seriously prejudicial. But appellant's failure to assert his rights weakens the suggestion that he suffered substantial personal prejudice in the form of either *oppressive* pretrial incarceration or anxiety and concern during

that interval. There is no indication in the record that appellant was even treated any differently from other patients at the hospital. We hesitate to conclude that the detention of a drug addict like appellant in a hospital, where he is subject to positive influences and is the recipient of rehabilitative efforts is, without more, necessarily oppressive or productive of anxiety on his part, particularly where he has made no complaint.

In addition, whatever pretrial prejudice resulted from personal anxiety and restraint on appellant's liberty after his November 5, 1970 motion to dismiss for lack of a speedy trial, during which time he was in the work-release program, does not appear substantial from anything that appellant has suggested.

Appellant relies primarily on cases decided by this court that suggest that when the delay in prosecution exceeds one year, prejudice is presumed and need not be affirmatively demonstrated. *See, e. g.,* United States v. Holt, 145 U.S.App.D.C. 185, 448 F.2d 1108, cert. denied, 404 U.S. 942, 92 S.Ct. 292, 30 L. Ed.2d 257 (1969); Harling v. United States, 130 U.S.App.D.C. 327, 401 F.2d 392 (1968), cert. denied, 393 U.S. 1068, 89 S.Ct. 725, 21 L.Ed.2d 711 (1969); Hedgepeth v. United States, 124 U.S. App.D.C. 291, 364 F.2d 684 (1966). We need not at this time decide to what extent these precedents remain viable after *Barker*.[7] It is sufficient to note that this court has previously declared that "even the prejudice which is presumed to inhere in all cases where the delay is particularly long must be weighed against the other considerations . . . ." United States v. Bishton, 150 U.S.App.D.C. 51, 463 F.2d 887, 891 (1972).

The Supreme Court in *Barker* indicated that the most serious form of prejudice is that which occurs when the de

---

7. In *Barker* the Supreme Court expressly left open the possibility of a "presumptive rule adopted by a court in the exercise of its supervisory power which establishes a fixed time period within which cases must normally be brought." Barker v. Wingo, *supra*, at

530 n. 29. However, where a balancing test is undertaken in the absence of such a rule, the *Barker* decision appears to stress an evaluation and weighing of actual prejudice, rather than that which might merely be presumed.

fense is impaired by the delay; for example, where defense witnesses are "unable to recall accurately events of the distant past." 407 U.S. at 532. Of course, the loss of memory by witnesses over long periods of time will ordinarily be less prejudicial to the defendant than to the prosecution, which bears the burden of proof at the trial.

Appellant argues that the amnesia, which he alleges developed after the crime and was caused in part by his incarceration, prejudiced his defense. However, we are not convinced that appellant's defense was prejudiced materially by the delay for several reasons. In the first place, the record does not clearly demonstrate that appellant ever established the fact that he was actually suffering from amnesia. Indeed, implicit in the judicial determination that appellant was competent to stand trial is the finding that either no amnesia existed or, alternatively, that if amnesia existed it was not so severe as to preclude appellant from properly assisting in his own defense.[8] Moreover, to the extent that any amnesia occurred prior to the delays, or from causes independent of delay, there is no justification for charging the resulting prejudice to the government. And apart from his assertion of amnesia affecting him, appellant does not claim his defense was impaired by the death, unavailability, or loss of memory of any other actual or potential witness.

■ Upon a careful consideration of all of the factors discussed above, we conclude that appellant was not denied his constitutional right to a speedy trial. Despite the long delay between arrest and trial, we decline to strike the balance against the governmnt under cir-

cumstances where a major portion of the delay was caused by appellant's own tactical maneuvering, where no intentionally dilatory practices can be ascribed to the government, where no demand for a speedy trial was made until most of the delay complained of had already occurred, and where only a tenuous demonstration of prejudice to appellant was shown. For these reasons we also reject appellant's claim that reversal is required because of "unnecessary delay" under Rule 48(b) of the Federal Rules of Criminal Procedure.

## II

We turn now to appellant's contention that the district court erred in permitting the government in its case in chief to introduce into evidence the preliminary hearing testimony of Laverne Brown. Because Miss Brown's status as a "crucial" government witness is significant, it is necessary to describe at some length the other evidence offered against appellant in connection with the death of Robert Mitchell.

There was substantial and undisputed evidence offered by the government at trial showing that the appellant was in close physical proximity to the deceased at the time of the fatal shooting. Shortly before the shooting, Mitchell, the deceased, who was a known seller of narcotics and an addict himself, was seen by several witnesses in the vicinity of 7th and N Streets. Priscilla Thompson testified that about ten or fifteen minutes prior to the shooting the deceased sold her some stockings in the carry-out restaurant where she worked at the corner of 7th and N Streets. Decedent also attempted to sell some stockings to a woman in the company of Melvin Da-

---

8. The provision governing mental competency, 18 U.S.C. § 4244 (1949), provides in relevant part:
 Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States

may be presently insane *or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense,* he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. (Emphasis added.)

vis near the corner of 8th and N Streets before walking up toward the corner of 7th and N. About five minutes later Davis observed appellant and a companion, James Wade, both known addicts, walking past him and proceeding in the direction of 7th Street. Five or ten minutes later, Davis heard several shots, and several minutes thereafter he saw a man running out of a nearby alley. Upon hearing a shot, Miss Thompson looked through the window in the carry-out shop and saw a man lying on the sidewalk. She then ran out into the street where she saw Wade taking money from the deceased's pockets.

The testimony offered at trial by Wade himself portrayed a slightly different picture. Wade testified that he and appellant were walking together, that they saw Mitchell on the corner of 7th and N Streets, and that appellant said that he wanted to talk to Mitchell about something. Wade testified that he then walked off down 7th Street, but heard two shots before he had gone half a block. When he turned around, Wade testified he observed the deceased stagger and fall to the ground, and saw a person running although he could not identify who it was. Wade then approached Mitchell, bent over his body and "held his arm," and then left the scene of the murder. Wade also testified that later that evening appellant came to his home to inject himself with drugs, and that appellant, in reference to the shooting, asked him "not to kick it around," and stated that "the man grabbed the gun and it went off."

Another witness, Ronald Crowder, who was walking with his girlfriend Laverne Brown and others to the carry-out shop, testified that he saw Wade and another man, whom he could not identify, come down the street with a third man whom they had "against the wall." Crowder also testified that he heard two shots, that he did not see the gun, but that Wade did not fire the shots.

Melvin Davis, Priscilla Thompson, and James Wade did not actually witness the shooting; and although Ronald Crowder saw the shooting, he could not identify the person who fired the shots.

Laverne Brown, who had been walking with Ronald Crowder, did not testify at trial, but because it was determined that she was "unavailable", her testimony from appellant's preliminary hearing was read into evidence over the objection of the defense. This testimony reveals, and the government concedes, that Miss Brown was a "crucial" witness because she was the only eyewitness to the murder who identified appellant as the slayer. In contrast, the testimony of Davis and Thompson appears to implicate Wade as much as, if not more than, it implicates appellant.

Laverne Brown had testified at the preliminary hearing that she knew both Wade and appellant previously, and that she observed them walking together and approach a man who had been attempting to sell stockings. Appellant, she testified, asked the man "Do you have the stuff," and after the man replied "no", she heard appellant say something like " 'You're going to get yours' ". Appellant and Wade then walked away but came back in about five minutes. Then, according to Miss Brown, appellant shot the deceased while Wade stood a few feet away.

Although Miss Brown had appeared at pretrial proceedings and was seen in attendance at the trial, she failed to appear on May 3, 1971, the date on which the prosecution had intended to close its case with her testimony. Later that afternoon, the prosecutor explained to the court that although her family had been contacted, Miss Brown could not be located, and that he and a detective were unable to find Miss Brown at her residence. The trial was continued until the following morning. After presenting the testimony of another witness, the prosecutor declared that Miss Brown was still unavailable and sought to introduce her preliminary hearing testimony. After testimony about the prosecution's efforts to locate Miss Brown and argument of counsel, the court ruled that Miss Brown was unavailable and that

her preliminary hearing testimony could be admitted and read into evidence.

Appellant contends that the admission of Miss Brown's preliminary hearing testimony violated both the Sixth Amendment to the United States Constitution [9] and Rule 26 of the Federal Rules of Criminal Procedure.[10] The first claim is derived from appellant's constitutional right to be "confronted with witnesses against him." The second claim is grounded upon the related common law evidentiary rule, applicable in the federal courts through Rule 26, that hearsay shall not be admitted unless it falls within a recognized exception.

Appellant supports both claims by his contention that Miss Brown was not "unavailable." In addition, appellant bolsters his constitutional claim with the alternative theory that even if the witness were unavailable, the requirements of the confrontation clause were not met in this case because there was an inadequate opportunity for cross-examination at the preliminary hearing where appellant was represented by a different attorney. The government responds, first, that the evidence clearly established that Miss Brown was unavailable at the time of trial; and, second, that the requirements of the confrontation clause are clearly met where the defendant had an opportunity to cross-examine and did in fact cross-examine the witness at the preliminary hearing.

 Preliminary hearing testimony is hearsay, McCormick on Evidence § 225, and hearsay evidence is generally inadmissible because it is less reliable than nonhearsay testimony: it may not have been offered under oath; there may have been no opportunity for cross-examination; and the jury is given no opportunity to observe the demeanor of the witness. *Id.* § 224. However, under certain circumstances, exigencies permit the use of hearsay even in criminal trials, despite its dangers, and a number of exceptions to the general prohibition have been recognized by the courts.

In regard to the use of prior-recorded testimony in criminal trials offered for the truth of the matter in the statement, this court has declared:

> It is the established rule in federal courts that testimony given in a former criminal trial is admissible in a retrial of that cause when the witness has become unavailable. The proponent of such evidence has the burden of establishing that the witness is unavailable . . . .

Coppedge v. United States, 114 U.S. App.D.C. 79, 311 F.2d 128, 132–133 (1962). *See also* McCormick on Evidence §§ 231, 234.

This rule finds support in the policies underlying the general prohibition of hearsay. And although the dangers of hearsay are mitigated to some extent by the safeguards of the oath and the opportunity to cross-examine in the former tribunal, the prior testimony should be admitted only when the witness is in fact "unavailable." Certainly, it is preferable for a defendant to have the opportunity to cross-examine and impeach a witness at trial before the jury that will decide his guilt or innocence. The appearance of the witness will permit the jury to observe his demeanor and enable it to better assess his credibility. These considerations are especially cogent when the testimony of a witness is

---

9. The Sixth Amendment to the United States Constitution provides in relevant part:
 In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him
 . . .

10. Rule 26 of the Federal Rules of Criminal Procedure provides:

 In all trials, the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an act of Congress or by these rules. The admissibility of evidence . . . shall be governed . . . by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

critical to the prosecution's case against the defendant.

■■ The requirement that "unavailability" must be demonstrated as a predicate to the introduction of the prior-recorded testimony of a witness makes even more sense when, as here, it is prior testimony from a preliminary hearing, instead of that from a previous trial, which is sought to be introduced. In suitable cases there may be no constitutionally significant difference, for purposes of protecting confrontation rights, between the opportunity to cross-examine at a preliminary hearing and at a prior trial. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). But a preliminary hearing is less likely to produce extensive cross-examination and impeachment of witnesses than a trial because of the different functions respectively of the trial, designed to determine guilt or innocence and the preliminary hearing, designed to determine only the existence *vel non* of probable cause to hold an accused to answer to the grand jury. *See* Barber v. Page, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). Therefore, it was incumbent upon the prosecution to demonstrate that Laverne Brown was unavailable as a necessary precondition to the introduction of her preliminary hearing testimony at appellant's trial.

■ We conclude that the district court's determination that Miss Brown was "unavailable" was erroneous. At least where the evidence indicates that a crucial government witness, who is physically and mentally capable of testifying, is within the jurisdiction of the court, the prosecution must demonstrate that it has been unable to obtain the witness' presence through a search exercised both in good faith and with reasonable diligence and care. In the ordinary case, this will require a search equally as vigorous as that which the government would undertake to find a critical witness if it has no preliminary hearing testimony to rely upon in the event of "unavailability."

In attempting to prove that it met the requirements for unavailability, the prosecution made much of its efforts to locate Miss Brown. Miss Brown was personally served with a subpoena, and the prosecutor, who had observed Miss Brown in court during the trial, told her at the conclusion of the court day preceding the one on which her testimony was desired, to appear in court, ready to testify on Monday, May 3, 1971. When she failed to appear on Monday morning, the government called another witness and took steps to locate Miss Brown. After that witness testified, the trial was recessed early and the case continued so the government could continue its efforts to locate the missing witness. A detective was sent to locate Miss Brown. The detective went to the home of her grandmother, interrogated her about Miss Brown's whereabouts, and ascertained that the grandmother thought she was across the street at an apartment with another girl. He then went to this apartment, knocked at the door and "kicked at the door . . . to make sure whoever was in would have heard me." He then went back to the grandmother's house and asked one of Laverne's younger brothers to try to arouse the occupants. He was unable to do so. The detective and his colleague then cruised the general area seeking to find her on the streets. That evening at 7 p. m., the detective again went to the home of the grandmother, who stated that she had not seen Miss Brown, but if she did she would call the homicide office to contact the detective. Subsequently, this detective left instructions for the detective who relieved him to have two men go to the grandmother's house in the morning to attempt to locate the witness and "if she was not there, to cross the street [to the friend's apartment]." These efforts did not result in any personal contact with Miss Brown. Subsequently, it was learned that Miss Brown was in the apartment when the detective first knocked, that she spent the night in the apartment, and left about 6 a. m. before the detec-

tives arrived. The two detectives then stayed on the scene at the apartment and were still there waiting to locate the witness when the court convened.

■ Although appellant has not suggested, and we do not hold, that the prosecution acted in bad faith in attempting to locate Miss Brown, we conclude that the government's efforts were insufficient. The prosecution does not claim to have inquired at the local hospitals, area police departments, the morgue, or of Miss Brown's employer. Indeed, the government itself asserted that its efforts to locate Miss Brown were limited on May 3 because policemen were needed elsewhere to work on "disturbance matters" arising from the May Day peace demonstrations on the previous weekend and because many detectives were "sleeping after having worked 24 hours straight."

Significantly, the prosecution represented in court on the morning of the 4th of May not only that Miss Brown had never expressed any unwillingness to testify but also that she was still in the jurisdiction. The prosecutor testified that Miss Brown had been in the apartment on the previous day and had refused to answer the door, that she had slept in the apartment overnight, and that the detectives had arrived at the apartment on the morning of May 4th too late to bring her to court because she had already departed at approximately 6. a. m. It is difficult to believe that if the preliminary hearing testimony of this critical witness were not available, the prosecution would have abandoned its efforts at this point to locate Miss Brown and concluded its case. We believe the prosecution would have asked the court for additional time within which to find her.

We are not prepared to equate "unavailability" with "evasiveness." The government failed to establish that Miss Brown could not have been located and brought to trial by a reasonably diligent search. Accordingly, we hold that the witness was not "unavailable" and therefore the predicate for the introduction of Miss Brown's preliminary hearing testimony at trial was not established. Moreover, the error was not harmless because the evidence improperly admitted was critical to the government's case.

■ We recognize that the Supreme Court has observed that "merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." California v. Green, *supra*, at 156. *See also* Dutton v. Evans, 400 U.S. 74, 80–83, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). However, because we base our holding solely on our supervisory powers and upon our view of the federal law of evidence,[11] we do not need to decide whether appellant's Sixth Amendment right of confrontation was violated by the admission of Miss Brown's prior-recorded testimony.[12]

---

11. *Id.*

12. In support of its argument for a relaxed standard of unavailability, the dissenting opinion cites Fed.R.Crim.P. 15(e). We regard this rule as inapposite for several reasons. It is elementary that legislation, or rules with the force and effect of legislation, may change common law standards for the admission of hearsay evidence so long as the confrontation clause of the Sixth Amendment, or any other relevant constitutional provision, is not offended. As the dissenting opinion recognizes, Rule 15 applies only to depositions taken by defendants. That rule has no application whatsoever here. We consider the admission of preliminary hear-

ing testimony, not a deposition; and, in addition, the provisions of Rule 15 do not permit by their terms a deposition to be taken by the government. Moreover, even within the proper scope of its application, it is not clear that Rule 15(e) was intended to alter, as the dissenting opinion would, the common law test for unavailability. Rule 15(e) expressly provides for the use at trial of a deposition, meeting the provisions of the Rule, only "so far as otherwise admissible under the rules of evidence." If these words are given their literal meaning, then it begs the question to rely upon Rule 15(e) to support a watered-down standard for unavailability.

Reversed and remanded for a new trial.

MacKINNON, Circuit Judge (dissenting):

My views diverge from those expressed in the foregoing opinion to the extent it concludes that the "district court's determination that Miss Brown was 'unavailable' was erroneous," (Majority Op. at 1023, *supra*) and that the murder conviction should be reversed on that ground.

After reciting the facts concerning the concentrated search made for Miss Brown, the majority opinion ignores the weight of these facts and finally flies into their face by implying that the prosecution did not meet the burden of proving a "search exercised both in good faith and with reasonable diligence and care." Majority Op. at 1023, *supra*. This extravagant statement exceeds the facts it allegedly relies upon and is contrary to the finding of the trial court which to my view is supported by substantial evidence and the majority opinion has not demonstrated the contrary.

My disagreement with the majority opinion is based essentially on two major points: (1) the proper formulation and application of the standard for determining the unavailablity of a witness, and (2) what constitutes "insufficiency"

Even if Rule 15(e) can be considered to have relaxed the standard of unavailability necessary for the admission of depositions noticed in accordance with its provisions, it does not suggest persuasively that by analogy a less rigorous prerequisite is good policy in other situations. Under Rule 15(a) a deposition may be taken in the first instance only in the limited circumstance where "it appears that a prospective witness may be unable to attend or prevented from attending a trial." Accordingly, in every case where a deposition may subsequently be introduced at trial under Rule 15(e), the opposing party has previously had notice that the recorded testimony is likely to be offered at trial. So, advised, he can include in his cross-examination questions that will help a judge or jury make a credibility assessment of the deposed witness. If the diluted standard urged in the dissenting opinion were adopted, counsel, in an abundance of caution, would be encouraged to conduct his cross-examination at a preliminary hearing as extensively as he would at trial or, failing to do so, risk the charge of having rendered ineffective assistance to his client. This would unduly protract preliminary hearings and distort their proper function.

Despite the government's concession that its efforts to locate Miss Brown were not up to par because of diminished police manpower following the crisis weekend of the May Day demonstrations, the dissenting opinion argues vigorously that what the government failed to do is wholly irrelevant because Miss Brown was in fact residing in her apartment. This fact, however, is not demonstrated in the record and the prosecution's statement to that effect to the court was based on hearsay. Indeed, if she were engaged in fleeing the jurisdiction, a confederate could give her additional time by telling the police that she was still residing in her customary abode. Alternatively, if we accept as settled fact that she was still residing in her apartment and had not attempted to flee the jurisdiction, then with only minimal additional effort this critical witness could have been brought to trial to testify in person. To suggest that Miss Brown was unavailable in this case is to dilute, without precedent, the protection afforded criminal defendants by the common law. Considerations of prosecutorial convenience and expedience cannot justify this departure from established standards.

The dissenting opinion ignores the fact that in this case a man was convicted of murder on the basis of conflicting and largely circumstantial evidence, with the exception of Miss Brown's preliminary hearing testimony, and that most of the testimony was elicited from persons who themselves were known to be addicts and a part of the same drug subculture in which both the deceased and the accused lived. If Miss Brown had altered her testimony at trial, or if the jury had declined to credit her testimony, the possibility that Wade, and not Lynch, had shot the deceased might have raised in the jurors' minds a reasonable doubt about Lynch's guilt. Although the dissenting opinion does not state that the admission of Miss Brown's testimony was harmless to the defendant, nevertheless there is the recital that "[t]here is thus substantial additional evidence which demonstrates beyond a reasonable doubt that the ingredients of the offense were proved without the testimony of Laverne Brown." *Infra* at 1036. We do not understand the evidence to support this assertion which might permit affirmance on the basis of harmless error.

in Government attempts to locate a witness. Although closely related, these two points are best analyzed separately.

## I. THE UNAVAILABILITY STANDARD

In my view the Federal Rules of Criminal Procedure by analogy provide a standard which should be applicable to the instant case. Rule 15(e) sets forth the circumstances under which a deposition may be *used* in a criminal trial. Under this Rule such depositions presently may only be taken at the instance of a defendant (Fed.R.Crim.P. 15(a)),[1] but may be introduced at trial by any party. Fed.R.Crim.P. 15(a), (e). The majority refused to recognize this latter point. Use of depositions and prior testimony both depend upon the "unavailability" of the witness. As Professor Wigmore states:

> There is on principle no distinction between a deposition and former testimony as to the conditions upon which either may be used at the trial.[2]

V Wigmore, Evidence § 1401 at 146 (3d ed. 1940). This is another point of law that the majority completely refuses to recognize. Thus, the standard that governs the *use* of *depositions* in criminal cases is persuasive authority on the *use* of prior *testimony*. The present Federal Rule provides, *inter alia*:

> At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used if it appears: That the witness is dead; or that the witness is out of the United States, unless it appears that the absence of the witness was procured by the party of-

fering the deposition; or that the witness is unable to attend or testify because of sickness or infirmity; or *that the party offering the deposition has been unable to procure the attendance of the witness by subpoena.*

Fed.R.Crim.P. 15(e) (emphasis added). Under this Rule any party including the Government, may offer a Rule 15(a) deposition in a criminal trial if it "has been *unable* to procure the attendance of the witness by subpoena." (Emphasis added.) The satisfaction of this condition, *as well as substantial additional effort by the Government,* was proved in this case. As Wigmore concludes, there is no justification, either in law or common sense, for requiring application of a stricter standard to prior testimony than to a deposition, and certainly no more should be required than was proven here. The proffer by the Government of prior testimony taken under oath before a magistrate, with the defendant present, with an unrestricted opportunity for his counsel to cross-examine the witness [3] and with full exercise of that right, adequately satisfies the requirement for the admission of prior testimony where the witness is unavailable.

It should also be noted that the witness would be "unavailable," and the testimony here questioned would be admissible under the Proposed Federal Rules of Evidence, presently pending approval in the Congress, H.R.5463, 93rd Cong., 1st Sess. (House Committee Print, Nov. 15, 1973). In the presently pending bill, Rule 804(a) defines unavailability— "Unavailability as a witness" includes situations in which the declarant "(5) is

---

1. However see the discussion at 1037, *infra*, with respect to 18 U.S.C. § 3503 which authorizes the Government to take depositions in criminal proceedings in certain instances.

2. The rule for admissibility of former testimony is the same in civil and criminal trials:
 There is on principle no distinction, as to the conditions of necessity for using depositions and former testimony, between *civil* and *criminal cases*. If absence from the jurisdiction (for example) is a necessity in

the one class of cases, it is equally a necessity in the other. The needs of public justice are as strenuous as those of private litigation. It is even more necessary that an offender against the community be duly punished than that a debtor discharge his private obligation.
 V Wigmore, Evidence § 1401 at 147 (3d ed. 1940).

3. There is no showing that the witness would testify substantially differently at this time.

absent from the hearing and the proponent of his statement has been *unable to procure his attendance* . . . *by process* or other reasonable means." The efforts of the Government here clearly meet this standard. The proposed Rule would further provide:

> (b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Former testimony.—Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, *if the party against whom the testimony is now offered* . . . *had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.*

Rule 804(b), Proposed Federal Rules of Evidence, *supra* (emphasis in original). Here the appellant had such opportunity and did actually cross-examine the witness on all the points he here points out as being material.

## II. THE GOVERNMENT PROVED UNAVAILABILITY

### A. *The Confrontation Clause—Significance of Unavailability*

California v. Green, 399 U.S. 149, 165, 168, 90 S.Ct. 1930, 26 L.Ed. 489 (1970) demonstrates conclusively that the confrontation rights of appellant here were not violated.[4] In *Green*, a witness' prior testimony was admitted against a constitutional challenge even though that witness was present and testified at trial. The *Green* Court fully discussed the important elements of the right of confrontation and it is clear that each of those elements, as authoritatively established by *Green*, was satisfied in this case. Miss Brown testified under oath before a magistrate with the defendant present. Defendant's counsel had an unrestricted opportunity to cross-examine her and in fact fully exercised that right to the extent that her cross-examination comprised 28½ out of 33 pages of the transcript of Miss Brown's testimony.[5]

Moreover, in *Green* the witness actually was produced and testified at trial. The significance of this fact is simply to demonstrate the obvious, that is, that the "availability" of a witness has no relation to the inherent trustworthiness of his prior testimony. Rather, availability, viewed in this perspective, simply goes to the nature, diligence and good faith of the Government's search. If these are established then manifestly the prior testimony is admissible under *Green*. A diligent, reasonable and good faith search by the Government would negate any inference of collusion between it and the witness or that the Government was aware that the witness might change stories; *no one even contends that collusion is involved here.* The facts of this case demonstrably prove that the Government did in fact make just such an extensive and good faith search for Miss Brown. The law does not and should not require anything more. In this connection it is submitted that a fair reading of the description of the search as set forth in the majority opinion will prove that the Government met the required standard.

### B. *Sufficiency of the Search*

No blanket rule can be stated for the admission of former testimony as there

4. The majority bases its reversal upon newly found "supervisory" powers without reaching any Sixth Amendment issue. *See* p. 1024 *supra.* It would have been more frank to admit that there was no Sixth Amendment violation in view of *Green, supra.* The reliance of the majority upon its alleged "supervisory" powers is proof that it is making new law and not relying upon established law. It would have done better to follow the law as stated by Professor Wigmore (Text at 1026, *supra*) and as is contained in the Proposed Federal Rules of Evidence presently pending in Congress. *See* text at 1026, *supra.* These rules are largely a codification of existing law.

5. Tr. 487–91 (Gov't) ; 491–520 (cross-examination).

are many grounds upon which it will be admitted or denied admission. We are here concerned with the admission of such evidence where the witness is absent because he has disappeared and the party proffering his prior testimony is unable to find him. On this precise point Wigmore states:

> If the witness has disappeared from observation, he is in effect unavailable for the purpose of compelling his attendance. Such a disappearance is shown by the party's *inability to find* him after diligent search. *The only objection to recognizing this ground of unavailability is the possibility of collusion between party and witness*; but supposing the Court to be satisfied that there has been no collusion and that the search has been "bona fide", this objection loses its force.

V Wigmore, Evidence § 1405 at 155 (3d ed. 1940) (second emphasis added). The foregoing statement fits this case like a glove and, since no collusion is shown here or even claimed, it refutes the ground upon which the majority would deny the admission of Miss Brown's testimony. The search that was made here was reasonably diligent by applicable legal standards.[6] In applying this rule all courts, except the majority here, recognize that *what constitutes "due diligence" is a matter resting within the sound discretion of the trial court and that its ruling will not be disturbed unless there is an abuse thereof.*[7] In my opinion there is no abuse of discretion whatsoever in the finding of the trial court.

The majority opinion, however, states that the Government did not prove it made "a search exercised . . . in good faith . . . ." Majority Op. at 1023, *supra*. However, further on it states it does "*not* hold, that the prosecution acted in bad faith in attempting to locate Miss Brown." Majority Op. at 1024, *supra* (emphasis added). So the majority cannot find "bad faith" but refuses to find "good faith"—an overly subtle distinction on the evidence here and an inadequate basis for upsetting a contrary finding by the trial court.

What the majority opinion does assert is "that the government's efforts were *insufficient*" (Majority Op. at 1024, *supra* (emphasis added)). It bases this claim of "insufficiency" on the following assertion:

> The prosecution does not claim to have inquired at the local hospitals, area police departments, the morgue, or of Miss Brown's employer.

Majority Op. at 1024, *supra*. Essentially, then, the majority contends that unavailability was not established because the Government failed to make a *sufficient* effort to locate Miss Brown. *The decision of the majority reversing this murder conviction depends wholly upon the weight and validity of this argument.* In my view it has no force whatsoever, and is merely a judicially contrived makeweight. This asserted basis of the majority opinion demonstrably lacks any support in the evidence since the record proves that one of the suggested inquiries was made and disproves the probability that any of the others would have

---

**6.** Croley v. Huddleston, 304 Ky. 811, 202 S. W.2d 637, 639 (1947); People v. Myers, 239 Mich. 105, 214 N.W. 130, 131 (1927); People v. Moore, 306 Mich. 29, 10 N.W.2d 296, 298 (1943); Stevens v. State, 94 Okl.Cr. 216, 232 P.2d 949, 954 (1951). State v. Carr, 67 S.D. 481, 294 N.W. 174 (1940) is a case where the search was found to be inadequate to establish that the witness "after due diligence cannot be found." All that was shown was that the sheriff had been unable to serve the subpoena. Incidentally, statutes providing for conditions of admissibility are not to be taken as exclusive. V

Wigmore, Evidence § 1414 at 189 (3d ed. 1940).

**7.** 20 Am.Jur. §§ 705–06 at 592–94; 31A C.J. S. Evidence § 391 at 963–964 nn. 83, 84, 85; Cameron v. Ah Quong, 175 Cal. 377, 384, 165 P. 961 (1917); Long v. California-Western States Life Ins. Co., 43 Cal.2d 871, 279 P.2d 43 (1955); Kagan v. St. Louis Public Service Co., 360 S.W.2d 261 (Mo. App.1962); Shields v. Larry Const. Co., 370 Pa. 582, 88 A.2d 764, 767 (1952); In re Falzone, 240 Mo.App. 877, 220 S.W.2d 765, 770 (1949).

been fruitful. See detailed discussion, *infra*, at 1030. Moreover, it is of some significance that appellant's counsel, who was also trial counsel, and thoroughly familiar with the background of the disappearance and search for the witness, never had the temerity on this appeal to suggest that the search might have been deficient for any of the four reasons the majority opinion now asserts. In fact, at the trial he twice objected to allowing *any* time for a search.

The evidence demonstrates that in fact the Government did make a good faith effort to locate the witness. First, she was *personally* served with a subpoena (Tr. 459) and she appeared in response thereto. Thereafter, not having been called on Friday (Tr. 459), she was orally directed under the continuing compulsion of the subpoena to appear at 8:30 on Monday morning (Tr. 459, 476) and agreed to do so (Tr. 389, 459). When she failed to appear on Monday (Tr. 477), the Government called another witness and then took immediate steps to locate Miss Brown (Tr. 389). After two witnesses testified the trial was recessed at 11:13 A.M. until 3:09 P.M. to give the Government a further opportunity to find the witness (Tr. 386, 389). In the process of the search a detective and the U.S. Attorney attempted to locate Miss Brown, contacted her family and visited her house. They also went to the home of her grandmother (Tr. 477), interrogated her as to Miss Brown's whereabouts and ascertained that the grandmother thought she was across the street at an apartment with another girl (Tr. 477). Thus, their earliest contacts indicated that the witness was most likely in the neighborhood. They then went to this apartment and the detective knocked and "kicked the door . . . to make sure whoever was in would have heard me" (Tr. 477–78). When no one responded they then returned to the grandmother's house and asked one of Laverne's younger brothers to try to arouse the occupants. He was unable to do so (Tr. 478). The detective and the U.S. Attorney then cruised the general area seeking to find her on the street (Tr. 478).

Not finding her, they posted a detective at the house, and reported back to the court where the Government requested a further reasonable opportunity to produce the witness. At this point the defense objected to any further continuance to attempt to locate the witness because she "has been available . . . . She is the key Government witness [and] she didn't show up today" (Tr. 390). The court, however, noted that because of local demonstrations and near riots local transportation was impeded and the court had not had the usual support of the Police Department and the Marshal's office because of their 24-hour involvement with the demonstrations (Monday, May 3, 1971) and *again recessed the trial* and continued it until the next morning to allow the Government a reasonable opportunity to continue its search for the witness (Tr. 389–92, 397).

That evening at 7 P.M., the detective again visited the grandmother at her home, who stated she had not seen Miss Brown, but if she did she would call the Homicide Office and she knew how to contact the detective (Tr. 478). Again, at 10 P.M., the detective went back to the grandmother's house, but Miss Brown had not been heard from (Tr. 478). The detective then left instructions, through the lieutenant in charge, for the detectives who relieved him to have two men from the police department go to the grandmother's house in the morning to attempt to locate the witness and "if she was not there, to cross the street [to the friend's apartment]" (Tr. 470). The search for Miss Brown continued in this manner but without success (Tr. 479). Two detectives remained at the apartment in the hope of finding Miss Brown and were still there when court convened (Tr. 396). However, all efforts to find her or to secure her attendance as a witness up until testimony was closed proved unsuccessful (Tr. 396). It was subsequently learned that Miss Brown was in the

apartment when the detective first knocked, but she did not respond; she spent the night in the apartment and left around 6 A.M. in the morning before the detectives arrived (Tr. 396, 460, 479).[8] Upon the above showing at a voir dire hearing the court formally ruled that the witness was "unavailable" (Tr. 485) and reconvened the trial.

At this point the Government decided to call Wade as a witness and defendant's counsel again objected on the ground that it was "just a delaying tactic to give the Government more time to find Mrs. [*sic*] Brown" (Tr. 399). Meanwhile the Government continued the search. *Thus, despite the objections of the defendant, the Government continued its attempt to find Miss Brown* but their efforts were unsuccessful.

Such an extensive, round-the-clock search, indicating that the witness was alive and moving from place to place, absolutely refutes the majority findings that the search was "insufficient" because the detectives on the police force did not inquire "at the local hospitals, [and] the morgue." Under the facts outlined here inquiry at those places would be clearly useless and hence was not required. Why look at the morgue or a hospital for a person you know is alive and moving around? It is also significant that we presently know, and as the judge knew at the time of his ruling (Tr. 396, 460, 479), that the detectives were looking in the places where Miss Brown had been and was likely to be.

As for inquiring at "area police departments," it was area police detectives who were conducting the search, so the Government *did comply* with that requirement. As for questioning "Miss Brown's employer," there was no showing at the hearing or now that Miss Brown had an employer. She was only about 17 or 18 years old at the time of

trial (Tr. 317). Therefore this appellate court cannot honestly base "insufficiency" in the search on any of the four hypothetical inquiries it now asserts the Government should have made. None of the four suggestions contrived by the majority opinion, none of which were raised by appellant at trial or on this appeal, are, by any practical measure, adequate to support its finding of insufficiency—two were useless and unreasonable under the circumstances, one was fully satisfied and there was no basis whatsoever in the record to suggest the fourth.

Nevertheless, on such grossly inadequate grounds, the majority opinion overturns the findings of the trial court that the Government had demonstrated the "unavailability" of the witness and reverses a murder conviction. To quote Shakespeare, "Sir, you speak a language that I understand not."[9]

Unavailability is the converse of "availability" which means "ready, handy, convenient . . . obtainable." Webster's Third New International Dictionary. It is submitted that the diligent and continuous search for Miss Brown conducted by two detectives (relieved by two more detectives) at the places where Miss Brown was likely to be, clearly supports the finding of the trial court (Tr. 485) that the witness was not "ready, handy, convenient . . . obtainable." There is thus no basis for this court on appeal to conclude, as it does, that this finding of the trial court was erroneous.

The trial was recessed *twice* to permit the detectives to make an extended search for her. In view of this it is highly unreasonable to suggest that the search was not "reasonably diligent" on the claim that the prosecution should have asked for *additional time* within which to find her. This would have necessitated a further recess of the trial.

---

8. The majority opinion impermissibly attempts to negate this testimony by terming it hearsay, but it was received without objection and is probative evidence. *See* note 17 *infra* and accompanying text.

9. W. Shakespeare, *The Winter's Tale*, III, 2, 80.

While a less busy and congested court than the District Court of the District of Columbia might be able to deal with its calendar in such a leisurely fashion as the majority suggest, it is my view that given the great demands on the trial courts of this circuit and their "established practice" which sets specific dates for the trial of all cases long in advance of trial, that the recesses that were taken, with the court delay they encompassed, were all that was reasonably required under the circumstances. The witness was obviously secreting herself and there was no assurance then, nor claim now, that she could have been located within the period of another recess. In fact, the only reason the court granted the extended recesses it did was because of the irregular local conditions which resulted from the demonstrations and riots in the city (Tr. 483).

The whipsawing that the Government receives between the defendant's objections at trial and the majority opinion on appeal is especially disconcerting and clearly irregular. Defense counsel at trial twice *opposed* allowing the Government additional time to search for Miss Brown (Tr. 390, 399). Now the majority opinion finds that the prosecution erred because it had *not* "asked the court for *additional time* within which to find her." (Majority Op. at 1024, *supra* (emphasis added)). In my view it is an improper administration of justice, to which I vigorously dissent, for an appellate court to reverse a murderer's conviction because the Government finally acceded to the objections of his counsel against delaying the trial to search for a missing witness. The Government continued its search until the last available moment and the defense never complained at trial that the search was inadequate—only that the Government was being allowed too much time for the search. Moreover, counsel for appellant at trial stated: "I think the Government has done everything it legitimately can do to bring this case to justice, at least insofar as prosecuting Mr. Lynch is concerned" (Tr. 400).

## C. *Evasiveness is an Element of Unavailability*

The majority opinion states that it is "not prepared to equate 'unavailability' with 'evasiveness.'" My answer to this argument is to rely upon a paraphrase of a recent decision by Judge Tamm: "[I] do not think this brief and conclusory statement is sufficient to sustain the . . . rejection of the [finding of the trial court]."[10] Certainly "evasiveness" in witnesses is one element that makes them "unavailable" at trials and makes it impossible for police, sheriffs and marshals to procure their attendance despite their most diligent efforts. To refuse to find that a witness is unavailable because he is evading his responsibility to testify is to ignore a highly important reason and frequent cause for unavailability. Any person familiar with the criminal trials in this circuit knows that many witnesses are evasive, unavailable and reluctant because of *fear* of bodily harm.[11] Some witnesses who did not adequately protect themselves recently are dead—murdered in cold blood to prevent them from testifying. So "evasiveness" should not be viewed merely in the abstract. Here we have a 17 or 18 year old girl who was evading her obligation to testify against what appeared to be a cold blooded murderer—apparently engaged in the iniqui-

10. American Smelting & Refining Co. v. FPC, 161 U.S.App.D.C. 6, 494 F.2d 925 (decided January 21, 1974).

11. *The Washington Post* of January 15, 1974 reports on a Justice Department study of criminal offenses in the District of Columbia that finds:

Nearly half the criminal cases that have been dismissed before coming to trial in Washington for the past several years have involved a failure by witnesses to cooperate, many of them expressing a fear of reprisal by the defendants, according to a Justice Department study.

Those of us who daily read transcripts of criminal trials in this District know the large part that fear and friendship play with respect to a witness testifying in criminal trials.

tous narcotics traffic. Her evasiveness could have been based on more than just a juvenile desire not to testify. Indeed, many stouthearted citizens would view the obligation to testify under such circumstances with some trepidation. It is submitted that any fair interpretation of "unavailability" would not exclude "unavailability" caused by evasion. From a practical perspective it must be obvious that a witness who is unavailable because he is evasive is just as "unavailable" as a witness who is unavailable for any other reason short of death.

In essence, the majority attempts to rewrite the law to equate the evasiveness of this juvenile with bad faith and collusion and to hold that the Government is responsible therefor. There is no evidence whatsoever that the Government caused her absence or knew where she was. As a witness she was not the property of the Government. The Government did not create her. She happened to be a witness to a crime and the Government had an obligation to call her as a witness and pursuant to its obligation it called her in the proper manner to testify. The Government in a criminal case cannot pick and choose its witnesses, it has to take them where it finds them. The missing witness here did know the defendant and had seen him previously five or six times at Wade's house, the last time within a week or two of the shooting (Tr. 517–18). Under such circumstances it would be more reasonable to equate her sudden absence from the trial with her acquaintance with the defendant,[12] with her lack of desire to testify against a person she knew, however slightly, or with an understandable fear to testify against a person she had seen murder a man in cold blood. There is, however, no basis in the law on the facts of this case to

reach the result dictated by the majority, *i.e.*, that the witness' absence should be held against the Government as though it were guilty of negligence or nonfeasance. Moreover, the public interest would be abused and justice frustrated by a rule that excludes prior testimony of witnesses who are acquaintances of the defendant where the witness evades testifying because of personal friendship or fear caused by having seen the accused conduct himself in a highly vicious and ferocious manner.[13]

## III. PREJUDICE—ADEQUACY OF THE CROSS-EXAMINATION

Is there any demonstrable prejudice to appellant from the introduction of Miss Brown's preliminary hearing testimony? The majority opinion states:

> Preliminary hearing testimony is hearsay, McCormick on Evidence § 225, and hearsay evidence is generally inadmissible because it is less reliable than nonhearsay testimony: it may not have been offered under oath; there may have been no opportunity for cross-examination; and the jury is given no opportunity to observe the demeanor of the witness. *Id.* § 224.

Majority Op. at 1022, *supra*. The dangers of hearsay testimony are largely obviated in this case. One must strain the term to characterize Miss Brown's prior testimony as being more unreliable than the testimony she would have given at trial. There is no showing to this effect. If the procedural ground of unavailability is satisfied, her testimony is within the recognized exception to the hearsay rule and is properly admissible as substantive evidence. California v. Green, 399 U.S. 149, 165–168, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The testimony was given in open court before the magistrate. The defendant was present.

---

12. Miss Brown did not know Lynch "too well" (Tr. 518) but she did know him under the name of "Catfish," had seen him about five or six times prior to the night of the shooting; had last seen him about a week or two weeks before the night of the shooting at Sunny's (Wade's) house (Tr. 517–18).

She had also seen him "walking and I'd see him on the corner" (Tr. 518).

13. "We must not make a scarecrow of the law, Setting it up to fear the birds of prey . . . ."
W. Shakespeare, *Measure for Measure*, II, i.1.

The testimony was also given under oath and the greater part of its content was evoked on cross-examination by the counsel for the accused (Tr. 491–520). Thus, the only objection of the majority that was not satisfied is the fact that the jury lacked the opportunity to observe the demeanor of the witness. Demeanor under such circumstances, however, is not considered to be of controlling significance since the law does permit the introduction of prior testimony from preliminary hearings and depositions as substantive evidence.

Professor Wigmore answers the demeanor argument made by the majority opinion as follows:

> Nevertheless, the secondary advantage, incidentally obtained for the tribunal by the witness' presence before it—the demeanor-evidence—is an advantage to be insisted upon whenever it can be had. No one has doubted that it is highly desirable, if only it is available. But it is merely desirable. Where it cannot be obtained, the requirement ceases. It is no essential part of the notion of confrontation; it stands on no better footing than other evidence to which special value is attached; and just as the original of a document . . . or a preferred witness . . . may be dispensed with in case of unavailability, so *demeanor-evidence may be dispensed with, in necessity.* Accordingly, supposing that the indispensable requirement of cross-examination has been satisfied, the only remaining inquiry is whether the demeanor-evidence, to be obtained by the witness' production before the tribunal, is available.

V Wigmore, Evidence § 1396 (3d ed. 1940). The points made by Wigmore are completely destructive of the position of the majority. Moreover, the magistrate here did have an opportunity to pass upon the demeanor of the witness and the action he took indicated that he credited her testimony.

The majority opinion argues further:

> But a preliminary hearing is less likely to produce extensive cross-examination and impeachment of witnesses than a trial because of the different functions respectively of the trial, designed to determine guilt or innocence, and the preliminary hearing, designed to determine only the existence *vel non* of probable cause to hold an accused to answer to the grand jury. *See* Barber v. Page, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

Majority Op. at 1023, *supra.* This argument might have some application in some cases but has none here because the defendant did "produce extensive cross-examination." The argument is also exploded by California v. Green, *supra,* and according to Professor McCormick is otherwise largely discredited:

> In many of the cases the former testimony was given at a preliminary hearing, and an argument can be made that strategy often dictates little or no cross-examination at that stage, since ample opportunity will be afforded at trial. *However, the argument has not been received favorably by the courts.*

McCormick, Evidence, § 255 (2d ed. 1972) (emphasis added). Moreover, as McCormick states:

> Actual cross-examination, of course, is not essential, if the opportunity was afforded and waived.

*Id.* A review of the cross examination of the witness at the preliminary hearing reveals that it was in fact extensive and adequate (Tr. 491–520).

The majority, in discussing the absence or inadequacy of cross-examination, touches upon a point that would have merit if there were some deficiency in this respect, but, since defendant's counsel here had free rein on cross-examination and he examined on all the points that he here states are material, when he raises this point it resolves into a straw argument. Miss Brown was

thoroughly cross-examined by defendant's counsel at the preliminary hearing upon all the precise points that appellant here alleges to be material (Tr. 491–520). Notwithstanding this, counsel for defendant at trial claimed that the cross-examination had not been adequate; and he now again bases his claim of inadequacy upon the same ground, i. e., that defendant's counsel at the preliminary hearing had not asked the

> *main question* which should be put to Laverne Brown, should she testify, and that is *where exactly she was standing when she saw all of this* (Tr. 471) . . . *"Where were you standing at the moment the shots were fired?"* (Tr. 472) (emphasis added).

Whoever makes this point could not have read the cross-examination of Laverne Brown at the preliminary hearing. This appears at Tr. 491–520 and it should be read. In the preliminary hearing testimony Miss Brown's location in relation to the church was precisely stated and thus the trial court correctly rejected the defendant's objection with the pertinent observation, "Well, the church doesn't move" (Tr. 472).[14] Moreover, at the preliminary hearing defendant's counsel on cross-examination of Miss Brown, by actual count asked over 22 questions directed to where she was standing when she saw the murder (Tr. 493, 494, 495, 496, 502, 503, 504, 505, 509, 512, 513, 517). These citations are dispositive of any claim of prejudice and it is significant that the majority opinion makes no effort to meet them. So it must be admitted that the testimony at the preliminary hearing *did* adequately cover all the questions and issues that appellant's counsel at trial and on this appeal claimed had not been covered. Interrogation of Miss Brown on these points by appellant's own counsel was extensive and complete. It was also conducted without any interruption or objection whatsoever (Tr. 491–520). In

addition, the location of Miss Brown at the time she observed the murder was also determinable from a diagram introduced into evidence at the trial (Tr. 347) *and from the testimony at trial of her boy friend (Crowder) who was with her all the significant times* (Tr. 318, 321, 323, 324, 326, 329, 337, 347, 348, 349, 497, 503) *and who was cross-examined at trial* (Tr. 342–51). His testimony corroborated the prior preliminary hearing testimony of Miss Brown. So the record reveals that cross-examination was adequate on all points.

## IV. THE GOVERNMENT PROVED ITS CASE AGAINST APPELLANT WITHOUT THE TESTIMONY OF MISS BROWN

In certain cases where the question of guilt or innocence is close, an appellate court might well be justified in overturning a conviction to prevent a possible miscarriage of justice. This, however is not such a case. My view of the evidence is that the jury would have found appellant guilty beyond a reasonable doubt even without the testimony of Miss Brown. The Government's case was complete and strong—without Miss Brown's testimony. Crowder—who was with Miss Brown at all times that she observed the events (Tr. 318, 321, 323, 324, 329, 336, 337, 497, 503)—and was her "boy friend" (Tr. 317)—testified that he saw two men who "had another man against the wall" (Tr. 324). "They approached the man against the wall and I heard two shots" (Tr. 326). "[*Sunny —who was with appellant—was not*] the man who fired the shots" (Tr. 327, emphasis added). This is equivalent to saying that appellant—the other man— did fire the shots.

The majority opinion thus understates the probative force of this testimony of Ronald Crowder, who "saw the shooting," when it states "he could not identify the person who fired the shots." The testimony is that appellant Lynch

---

14. The location of the witness in relation to the church was precisely stated a number of times in her testimony.

was with Sunny (Wade) when they accosted the victim (Mitchell). The testimony of Davis (Tr. 248, 249), Wade (Tr. 419–20) and Brown (Tr. 490, 501–02, 506–08) all put Lynch, Wade and Mitchell together just before the shooting. Wade said he moved away before the shooting. No testimony puts any person with Mitchell except Lynch and Wade. Crowder testified that the man with Sunny was "the man who fired the shots." On all the available evidence that could *only* have been Lynch—the appellant—and this identification of Lynch as the man who fired the shots stood up on cross-examination:

Direct examination: Crowder:

Q Are you able to say whether or not he [the man with Sunny] is the man who fired the shots?

A Yes.

Q Is he, in fact, the man that fired the shots?

A Yes.

Q How many shots do you recall being fired, Mr. Crowder?

A Two.

Tr. 327–28. On cross-examination:

Q Isn't it a fact that you really don't know who shot him?

A I know who shot him.

Q So your testimony is the same?

A Yes.

Tr. 351.

To say in light of this testimony that Crowder "could not identify the person who fired the shots" is to ignore the plain import of the testimony. He did identify Lynch for all practical purposes and appellant's counsel indicated as much by his above quoted cross-examination. Crowder merely did not identify Lynch by name or point him out. To say that the man with Sunny was "the man that fired the shots," was the equivalent of identifying Lynch as the murderer because all the other testimony placed Sunny and Lynch together at the time as the sole persons with the victim, though Sunny (Wade) testified he (Sunny) was down the street when the shots were fired. So, to this extent the testimony contradicts the statement of the majority opinion that Miss Brown "was the only eyewitness to the murder who identified appellant as the slayer." Majority Op. at 1021, *supra.*

There is additional incriminating testimony against Lynch. Wade testified that he saw appellant that night "about a half-hour" after the shooting (Tr. 421), and that appellant then admitted to being the man who was with Mitchell, the victim, when he was shot. Following is the significant part of Wade's testimony:

Q Now, did he [Lynch] say anything else to you when he came to the house that you remember now? Did he [Lynch] say anything to you sir, about the shooting that had taken place on the corner that you can recall?

A Yes.

Q What did he say, sir?

A He asked me not to kick it around.

THE COURT: Kick him out?

THE WITNESS: No. Kick it around. Around.

THE COURT: Would you repeat the whole thing.

THE WITNESS: He asked me not kick it around.

THE COURT: Not to kick it around?

THE WITNESS: Yes. So I asked him what happened. He [Lynch] said the man grabbed the gun and the gun went off.

Tr. 423–24 (emphasis added). So, from this evidence, any jury would be justified in finding that it was appellant Lynch who had his gun in his hand when it went off and killed Mitchell. *This testimony was introduced, without objection, was never controverted, and with the other testimony (without Miss Brown's testimony) is sufficient to support the conviction.* On appeal, it is ele-

mentary that the court is required to take that view of the evidence most favorable to the jury's verdict.

There was also additional incriminating testimony to the effect that later that evening when Lynch was in the kitchen of Mrs. Cathern C. Knott he reached into his pocket, took out a little black pouch, opened it up, there were some pills in it, and then Lynch and Wade used the pills to inject some dope into themselves (Tr. 163). Mrs. Knott then identified Government Exhibit No. 1 as a pouch of the "same approximate size, shape and color as the pouch [she] . . . described" (Tr. 164). Mrs. Knott considered the pouch to be distinctive "[b]ecause it had the color to it. The pills were in one side and in the other side was something else" (Tr. 164). She remembered that the "color . . . inside the pouch" was "either reddish or orange color" (Tr. 165). When appellant was arrested over a month later the police recovered a black pouch from his rear pocket with some narcotic paraphernalia in it. This black pouch was Government Exhibit No. 1 (Tr. 30–35) and was identical to the pouch described by Miss Brown and Mrs. Knott. Mitchell's brother also testified that the purse recovered from Lynch "looked like" his brother's purse (Tr. 30–35) which he described. The leather partition which divided the interior of the purse into two compartments was red, and the rest of the purse was black (Tr. 34–35, 165).[15]

There is thus substantial additional evidence which demonstrates beyond a reasonable doubt that the ingredients of the offense were proved without the testimony of Laverne Brown. Incidentally, this latter testimony corroborates that of Laverne Brown who testified that when Lynch shot Mitchell, Mitchell fell (Tr. 490), that Lynch then bent over Mitchell, went through his pockets and took what "[l]ooked like a black purse" (Tr. 516–17).

## V. FOOTNOTE 12 OF THE MAJORITY OPINION

At the end of the majority opinion, footnote 12 (hereafter "footnote") attempts to answer some of the points made by the dissenting opinion. Reply is here made *seriatim*.

*Paragraph 1.* This paragraph claims that Fed.R.Crim.P. 15(e) is inapposite because it can apply only where the confrontation clause of the Sixth Amendment is not offended. This oblique reference to the confrontation clause is meaningless since it is clear that appellant's confrontation rights were fully satisfied by the opportunity for, and the actuality of, full cross-examination. California v. Green, *supra*; Mattox v. United States, 156 U.S. 237, 240, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

Next, the footnote attempts to answer the Rule 15 analogy in the dissent by pointing out that the rule "applies only to depositions *taken* by defendants." The dissent does not contend that the rule "applies" to anything else, but only that its standards for the admission are persuasively analogous because, as Wigmore states, there is on principle no distinction between "a deposition and form-

---

15. By court order the exhibit was transmitted to this court as a supplemental record and has been examined. It is approximately 5″ x 3¼″ and has a partition that divides the pouch lengthwise through the middle into two compartments. The pouch is made of relatively thin pliable leather which is black on the outside and the dividing partition is "reddish . . . orange," exactly as described by Mrs. Knott. Mitchell's brother also testified that the interior was red (Tr. 34–35, 165). The partition was originally more red than it now appears. The redness appears to be more reddish near the outside of the partition while the part near the center appears more dark orange. This variation in color is caused by discoloration from use and from contact with the narcotics instruments which it contains. For Mrs. Knott to have described the inside of the pouch as accurately as she did would have required her to be reasonably close to it at some time when it was opened. The accuracy of her description, when compared with the actual pouch, lends added force to the reliability of her testimony in other respects as it tends to prove she saw exactly what she testified she saw.

er testimony" as to the conditions upon which either may be *admitted* at trial. Text at 1026, *supra*.

Third, the footnote comments that Rule 15 does not permit a deposition to be *taken* by the Government, as if that were determinative of any issue here. We are not concerned with *taking* depositions, or taking prior testimony, but only with *admitting* prior testimony. In this respect the footnote refuses to come to grips with the fact that, while Rule 15(e) allows only a defendant to *take* a deposition, after the deposition is taken, there are several provisions in the Rule that make it crystal clear that the deposition may be *admitted* at the request of *any* party, the defendant, another defendant, or the Government. *See* Rule 15(e). The fact that only the defendant can *take* a deposition under Rule 15 does not in any way detract from the analogy with respect to unavailability. In any event, a *complete answer* to the footnote's argument in this respect exists in the provisions of 18 U.S.C. § 3503 (1970), which *authorizes the Government* in the prosecution of organized criminal activity to *take* depositions under essentially the same circumstances as Rule 15, and once taken, their admissibility is tested against the same standards of unavailability as are specified in Rule 15.[16] Thus under either provision, depositions taken by the Government and by the defendant are treated equally with respect to *unavailability*.

The comment in the footnote that Rule 15(e) "begs the question [on] unavailability" because it applies only "so far as otherwise admissible under the rules of evidence" is specious. Subsection (e)'s precise purpose was to insulate a Rule 15 deposition from *hearsay* attack, that is, to codify the exception to the hearsay rule within which a deposition proffered for the substantive truth of its contents would otherwise fall. The Rule thus authoritatively defines "unavailability" for the purposes of meeting hearsay objections. On this analysis, it must be obvious that the phrase "so far as otherwise admissible under the rules of evidence" refers to *other* rules of evidence than the hearsay rule, as for example, relevancy and materiality, the adequacy of notice, the competency of the deponent as a witness, possible perjury, or possible privilege.

*Paragraph 2.* In addition, the footnote argues that in a deposition the parties have advance notice that it "likely" will be used at trial and they can tailor their cross-examination, and that such advance notice is not present with prior testimony at a preliminary hearing. However, prior testimony is very frequently offered at trial and the numerous rules of law permitting it to be admitted at trial for one purpose or another constitute sufficient advance notice to all lawyers at preliminary hearings as to the possible future use of such testimony at trial. Moreover, appellant in this case covered *all* the points on cross-examination that he claims he would have covered at trial. *See* text 1033–1034, *supra*; Tr. 491–520. As for the comment that permitting the introduction of preliminary hearing testimony would unduly lengthen such proceedings, the law and rules permitting such

---

16. The House Report on § 3503 states:

This title authorizes the Government to preserve testimony by the use of a deposition in a criminal proceeding, a right which now exists only for the defendant under the Federal Rules of Criminal Procedure (rule 15).

As amended by the committee, the Government's right to obtain a deposition would depend on certification by the Attorney General or his designee that the legal proceeding is against one who is believed to have participated in organized criminal activity. In addition, the title has been amended to make clear that the Government's right of access to depositions shall not infringe a defendant's rights under the fifth amendment. Also, it is provided that the scope of examination and cross-examination shall be the same as would be allowed in the trial itself.

H.R.Rep.No.1549, 91st Cong., 2d Sess. 33–34 (1970), U.S.Code Cong. & Admin.News 1970, p. 4009.

use have been in effect for a long, long time without the dire consequences the footnote suggests.

*Paragraph 3.* In this paragraph the majority opinion indicates a misconception with respect to the effect of hearsay testimony which is admitted into evidence without objection. It alleges that the fact that "Miss Brown was in fact residing in her apartment . . . is not demonstrated in the record and the prosecutor's statement to that effect to the court was based on hearsay." Well it *is* "demonstrated in the *record*," by the testimony of Detective Chaillet who was participating in the search. He testified:

I have learned since then that the mother says that she was in there [the apartment] at the time I was knocking on the door. Tr. 479.

Of course this is hearsay. There was no concealment of that fact. That is what any report on any search entails. But *such testimony was admitted without objection and was never contradicted.* In this country the general rule supported by the overwhelming weight of authority is that where ordinarily inadmissible hearsay evidence is admitted into evidence without objection it may properly be considered and accorded its natural probative effect, as if it were in law admissible.[17] So the footnote in this respect makes no rational point.

The footnote next states that "with only minimal additional effort this critical witness would have been brought to trial to testify in person." This Monday morning quarterback comment needs no reply other than to label it for what

it is—a belated prediction based on hindsight—the deficiencies of which are too well known to necessitate any discussion.

*Paragraph 4* contains the most significant statements in the entire opinion of the majority for it discloses the *real reasons* for reversing the conviction. In a nutshell it contends reversal is justified because the evidence was

*largely circumstantial,* with the exception of Miss Brown's preliminary hearing testimony, and that most of the testimony was elicited from persons who themselves were known to be addicts and a part of the same drug subculture in which both the deceased and the accused lived. (Emphasis added.)

There was nothing circumstantial about the significant testimony given by Wade and Crowder. Their significant testimony was that of eyewitnesses. Also, Lynch's admission that his gun killed Mitchell was not circumstantial and such testimony was unobjected to and uncontroverted (Tr. 424). Text at 1035, *supra.* Also Crowder testified that the man with Wade (Lynch) fired the shots (Tr. 327–28). Text at 1035, *supra.* Hardly a circumstantial bit of evidence.

As for the attack by the footnote on the character of the witnesses, there is no legal requirement that witnesses must frequent houses of worship, and some courts in cases such as this so instruct the jury. The effect of the character of the witness as it relates to the credibility of their testimony, as the weight to be afforded circumstantial evidence,[18] is for the jury and not for

---

17. Spiller v. Atchison, T. & S.F. Ry. Co., 253 U.S. 117, 130, 40 S.Ct. 466, 64 L.Ed. 810 (1920); Rowland v. Boyle, 244 U.S. 106, 108, 37 S.Ct. 577, 61 L.Ed. 1022 (1917); Diaz v. United States, 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500 (1912); Byars v. United States, 238 F.2d 82 (6th Cir. 1956); Beaconwear Clothing Co. v. United States, 355 F.2d 583, 591, 174 Ct.Cl. 40 (1966); Damon v. Carrol, 163 Mass. 404, 408, 40 N. E. 185 (1895); and see Note, 79 A.L.R.2d 890.

18. The footnote comment on circumstantial evidence indicates that it treats circumstantial evidence in a manner contrary to what is required by the Supreme Court's decision in Holland v. United States:

Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that

this appellate court. Thus, when the majority usurps the functions of the jury, as its statement in this paragraph of the footnote indicates it does, it exceeds its appellate function. In this respect the reversal by the majority [19] is shown to rest not only upon an improper standard as to the probative effect of circumstantial evidence,[20] but also upon unjustified speculation as to what might have happened at trial under different circumstances and upon a completely unwarranted usurpation of the right of the jury to evaluate the evidence and to determine credibility.

The footnote correctly asserts that the dissent does not argue harmless error with respect to the admission of Miss Brown's testimony. The admission of evidence under well-recognized and long-standing exceptions to the hearsay rule is not error and no amount of pure repetitive assertion can make it so. Harmless error need not be argued because there was no initial error.

Throughout n.12 the footnote repetitiously asserts without any citation of authority, in effect, that the dissent would "dilute," "alter," etc. the "common law test for unavailability." But it is the majority opinion that asserts a new definition of unavailability that would define it to exclude "intentional unavailability." This would be a new rule, and as proof of that reference need only be made to the statement in the majority opinion that it is basing this holding on its "supervisory powers" (Majority Op. at 1024, *supra*)—hardly a common law authority or a prior adjudicative authority.

## VI. THE DICTA RE SPEEDY TRIAL

One other feature of the majority opinion that deserves discussion is appellant's claim that he was denied a speedy trial and the consideration to be given in that claim to the time spent at St. Elizabeths Hospital before the mental examination he requested was completed. While the majority does not find that the time so spent, plus other delays, resulted in a denial of appellant's constitutional right to a speedy trial, it goes on to imply, in my view incorrectly, that the delay in obtaining a mental examination should, under some circumstances, be chargeable against the Government. That this is dicta should ordinarily obviate the necessity of comment but, since this circuit too frequently tends to transmute dicta into holding, one is sometimes well advised to abort

---

the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.
348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L. Ed. 150 (1954).

The footnote 12 comment is also contrary to the law as generally applied in this circuit which makes no distinction between the weight to be given direct and circumstantial evidence. The standard jury instruction on circumstantial evidence in the District of Columbia provides:

There are two types of evidence from which you may find the truth as to the facts of a case—direct and circumstantial evidence. Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as the testimony of an eyewitness as to what he saw. Circumstantial evidence is proof of a chain of facts and circumstances from which the existence or non-existence of a fact in issue may logically be inferred.

Both types of evidence are equally entitled to your consideration. *The law makes no distinction between the weight to be given to either direct or circumstantial evidence presented to you. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence.* You should weigh all the evidence in the case and find the facts in accordance with the preponderance of all the evidence, both direct and circumstantial.
Standardized Jury Instructions for the District of Columbia at 24 (Rev.Ed.1968) (Emphasis added).

19. Certainly no court would reverse a conviction solely on the ground that a search should have been continued a few hours longer *when the defendant was objecting to any search.*

20. *See* note 18 *supra.*

such prospective law before it quickens. The hazard that concerns me lurks in footnote 6 of the opinion where it states "that delay caused by congestion in hospitals should not be charged against the government *as readily as delay in the court is.*" (Emphasis added.) This implies that delay caused by *congestion in hospitals* under some circumstances should be charged against the Government.

In my view the proper standard to be applied in such circumstances is set forth in Minimum Standards of Criminal Justice of the American Bar Association. These standards provide that in determining whether one's right to a speedy trial has been denied there shall be an *exclusion* of:

> The period of delay. resulting from other proceedings concerning the defendant, including but not limited to an *examination and hearing on competency* and the period during which he is incompetent to stand trial, hearings on pretrial motions, interlocutory appeals, and trial of other charges. (Emphasis added.)

ABA Standards Relating to Speedy Trial (approved draft, 1968) § 2.3.

If that rule is to apply when the Government requests the examination, then, *a fortiori,* that should be the result when the defendant, as here, has requested the examination. In all fairness, such time should not be attributed to either party except in extreme situa-tions. Of course, if it were shown that either party acted in bad faith or intentionally delayed the proceedings and thereby secured an unfair advantage, the delay so caused might be charged against the party responsible for such conduct.

## VII. CONCLUSION

Appellant in this case based his claim of error upon a violation of his Sixth Amendment right to confrontation and it is significant that the majority opinion does not and cannot find a violation of any of his Sixth Amendment rights (Majority Op. at 1024 *supra*) because *Green, supra,* and Mattox v. United States, 156 U.S. 237, 240, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895) are contra. Instead, the majority opinion on the authority of pure assertion attempts to fashion a new rule based solely "on our supervisory powers and upon our view of the federal law of evidence. . . ." (Majority Op. at 1024 *supra*).[21] No authority is cited that would authorize the application of these rules to these circumstances in the manner the majority applies them. And the new rule that the majority would fashion would violate the rule presently approved by the Supreme Court in *Green, supra,* and the Proposed Federal Rules of Evidence.

In summary, I dissent from the reversal of the murder conviction and the setting aside of the finding of the trial

---

21. In predicating their decision "solely on our supervisory powers" the majority have exceeded their authority under the precedents of this circuit with respect to the exercise of such powers. This court, sitting *en banc* in United States v. Thomas, 146 U. S.App.D.C. 101, 449 F.2d 1177 (1971), held that it has "supervisory power over the administration of the law in this circuit," *id.* at 111, 449 F.2d at 1187, but intimated that it was necessary for the court to be sitting *en banc* before supervisory jurisdiction obtained. *Id.* at 110, 449 F.2d at 1186. The prerequisite of *en banc* consideration was wisely anticipated in United States v. Johnson, 139 U.S.App.D.C. 193, 432 F.2d 626, cert denied, 400 U.S. 949, 91 S.Ct. 257, 27 L.Ed.2d 255 (1970):

. . . a decision adopting such a [supervisory] rule prospectively might well be permissible for a panel, since it does not require overruling *Fulwood* on the grounds identified in that opinion. But in the circumstances before us *we think it more responsive to the tradition of this court for this kind of supervisory jurisdiction to be exercised, if at all, only by the court en banc.*

*Id.* at 200–201, 432 F.2d at 633–634 (emphasis added). The inescapable conclusion is that the majority decision today by two judges of this panel is not "responsive to the tradition of this court for this kind of supervisory jurisdiction to be exercised. . . ." *Id.*

court on the argument that the search for the missing witness was insufficient because the Government did not demand further time to continue the search when the *defendant had objected* to two prior requests of the Government for continuances that had been granted for the same purpose by the court over such objections. The majority thus reverses the conviction of defendant for an alleged error that resulted from the trial court and the prosecution finally acceding to appellant's demand to have the court resume the trial without the missing witness. This reversal accordingly is not based on any weakness or unreliability of the actual testimony but on a narrow procedural ground—that the court was in error because it did not interrupt the trial a third time, still over appellant's objection (Tr. 399) to continue the search possibly for a few hours longer.

The only point appellant attempts to make with respect to the testimony of the absent witness was that appellant's trial counsel should have been afforded the opportunity to cross-examine the witness as to where she was standing when she saw the murder. Testimony on that precise point, however, was fully elicited through extensive cross-examination by defendant's counsel at the preliminary hearing and at trial by cross-examination of Crowder who was with Miss Brown. Thus no objection is raised that in any way goes to the reliability of the testimony and the claim of prejudice in the lack of any cross-examination at trial is shown not to exist. I would accordingly affirm the conviction.[22]

22. While the proofs for this opinion were at the printer, the Supreme Court adopted certain amendments to the Federal Rules of Criminal Procedure, including Rule 15, which are to take effect on August 1, 1974. 42 U.S.L.W. 4551 (U.S. April 23, 1974). I would simply note with respect to the first paragraph of footnote 12 of the majority opinion, and with respect to pages 1025, 1026 and 1036–1038 of this dissent, that the amendments provide that a Rule 15 deposition may be taken at the instance of *either* party and no longer only on a defendant's motion. Fed.R.Crim.P. 15(a) (as amended). Rule 15(e), as amended, now provides in relevant part:

*Use.*—At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used as substantive evidence if the witness is unavailable, as defined in subdivision (g) of this rule . . . .

And the definition of "unavailability" continues to include the situation where the deponent merely "is absent from the hearing and the proponent of his deposition has been unable to procure his attendance by process or other reasonable means." Fed.R.Crim.P. 15(g)(5) (as amended).